**No. 24-5977**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

HAROLD C. WILLIAMS, JR. , et al.
*Plaintiffs-Appellants,*

v.

LEGACY HEALTH, et al.
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Washington
No. 3:22-cv-06004-TMC
Hon. Tiffany M. Cartwright

---

## NORTHWEST ACUTE CARE SPECIALISTS' ANSWERING BRIEF

---

Benjamin J. Stone, WSBA #33436
Kylene Slocum, WSBA #58600
Kimberly A. Holdiman, WSBA #57044
Lewis Brisbois Bisgaard & Smith, LLP
1111 Third Avenue, Suite 2700
Seattle, Washington 98101
(206) 436-2020
Benjamin.Stone@lewisbrisbois.com
Kylene.Slocum@lewisbrisbois.com
Kimberly.Holidman@lewisbrisbois.com
Attorneys for Defendant-Appellee Northwest
Acute Care Specialists

## TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................1

JURISDICTIONAL STATEMENT ...................................................................1

ISSUE PRESENTED .......................................................................................1

STATEMENT OF CASE ...................................................................................1

A.    Factual Overview..................................................................................1

B.    Higa Was Hired to Provide Direct Medical Care to Patients.........................3

C.    Legacy Initially Adapted Policies in Response to the COVID-19 Pandemic Short of a Vaccine Mandate and These Failed to Stop the Spread of the Virus ................................................................................4

D.    Legacy Mandated All Employees Be Vaccinated Based on the Weight of Scientific and Medical Evidence Showing that the Vaccine Was a Necessary Measure of Protection Against COVID-19.................................10

E.    The Vaccination Policy Ultimately Helped Legacy Combat the Surge in COVID Related Hospitalizations ...............................................16

F.    Higa Requested an Exemption to the COVID-19 Vaccine, But Was Ultimately Vaccinated and Returned to Work Full Time ...........................16

G.    Higa Filed A Claim of Religious Discrimination and the District Court Granted Summary Judgment in Favor of Legacy and NACS Based on Undue Hardship .....................................................................17

ARGUMENT…………………………………….…………………………..………20

A.    Summary of Arguments.....................................................................20

B.    This Court Reviews the Decision to Grant Summary Judgment De Novo...............................................................................................22

C.    Summary Judgment Is Proper Where There Is No Genuine Issue of Material Fact....................................................................................22

D.     Allowing Higa to Work In-Person Would Have Posed An Undue Hardship...................................................................................................24

    1.     Appellee Higa's Arguments on Appeal Regarding Consideration of Alternative Accommodations Fail Procedurally and Substantially………………………………………………………....27

        (a)     The District Court Did Not Rule That Legacy, or NACS, Failed to Consider Alternative Accommodations and Thus This Argument Is Procedurally Improper on Appeal………………………………..27

        (b)     Even If This Court Finds the Arguments Were Properly Before This Court, Substantially This Argument Fails Because NACS did Consider Alternative Accommodations………………………….30

    2.     The District Court Properly Found That Allowing Higa to Work Unvaccinated Imposed an Undue Burden………………….……33

CONCLUSION ..............................................................................................44

154225530.1

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..................................................................................22

*Ansonia Bd. of Educ. V. Philbrook*,
479 U.S. 60 (1986)...............................................................................32, 33

*Aukamp-Corcoran v. Lancaster Gen. Hosp.*,
No. cv 19-5734, 2022 WL 507479 (E.D. Pa. Feb. 18, 2022)............................43

*Balient v. Carson City*,
180 F.3d 1047 (9th Cir. 1999) ........................................................................26

*Beickert v. N.Y.C. Dep't of Ed.*,
No. 22-cv-5265(dli)(vms), 2023 WL 6214236 (E.D.N.Y. Sept. 25,
2023) ...............................................................................................27, 40

*Beuca v. Wash. State Univ.*,
No. 2:23-cv-0069-tor, 2023 U.S. Dist. LEXIS 88221 (E.D. Wash.
May 19, 2023)..............................................................................................35

*Bhatia v. Chevron U.S.A. Inc.*,
734 F.2d 1382 (9th Cir. 1984) ..................................................................26, 41

*Bolden-Hardge v. Off. Of Cal. State Controller*,
63 F. 4th 1215 (9th Cir. 2023) .............................................................25, 31, 41

*Bordeaux v. Lions Gate Ent., Inc.*,
No. 2:22-cv-04244-scw-pla, 2023 WL 81008655 (C.D. Cal. Nov.
21, 2023) ....................................................................................................26

*Buckingham v. US*,
998 F.2d 735 (9th Cir. 1993)...........................................................................31

*Bushra v. Main Line Health, Inc.*,
No. cv 23-1090, 2023 WL 9005584 (E.D. Pa. Dec. 28, 2023) ...................36, 39

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)......................................................................................22

*Clark v. Capital Credit & Coll. Servs*.,
    460 F.3d 1162 (9th Cir. 2006) .....................................................................23

*Dennision v. Bon Secours Chairty Health Sys. Med. Grp., P.C.*,
    No. 22-cd-2929 (CS), 2023 WL 3467143 ...............................................26, 41

*George v. Grossmont Cuyamaca Cmty. Coll. Dist. Bd. of Gov*.,
    No. 22-cv-0424-bas-ddl, 2022 U.S. Dist. LEXIS (S.D. Cal. Nov. 4,
    2022) ......................................................................................................35, 37

*Groff v. DeJoy*,
    600 U.S. 447 (2023)......................................................................25, 26, 31, 36

*Intel. Perip. Dev. Inc. v. SmartPad Inc*.,
    No. C95-4479-FMS, 1998 WL 75406 (N.D. Cal. Oct. 26, 1998).....................23

*Isaac v. Exec. Off. of Health & Hum. Servs*.,
    No. CV 22-11745-RGS 2023 WL 8544987 (D. Mass. Dec. 11,
    2023) ......................................................................................................42, 43

*Keenan v. Allan*,
    91 F.3d 1275 (9th Cir. 1996) ........................................................................23

*Koepke v. Fonteechhio*,
    177 F.2d 125 (9th Cir. 1949) ........................................................................22

*Kumar v. Gate Gourmet, Inc*.,
    180 Wash. 2d 481, 325 P.3d 193 (Wash. 2015) .............................................24

*Kunin v. Benefit Tr. Life Ins. Co*.,
    910 F.2d 534 (9th Cir. 1990) ........................................................................22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp*.,
    475 U.S. 574 (1986)…………………….………………………………...23

*MacDonald v. Or. Health & Sci. Univ*.,
    No. 3:22-cv-01942-IM, 2024 U.S. Dist. LEXIS 118542 (D. Or.
    July 5, 2024).................................................................................................39

154225530.1

iv

*Momox-Caselis v. Donohue*,
  987 F.3d 835 (9th Cir. 2021) ...............................................................28

*Nunes v. Wal-Mart Stores, Inc.*,
  164 F.3d 1243 (9th Cir. 1999). Although the Appeal Brief ........................32, 33

*Opuku-Boateng v. California*,
  95 F.3d 1461 (9th Cir. 1996) ..............................................................26

*Petersen v. Snohomish Reg'l Fire & Rescue*,
  No. C22-1674 TSZ, 2024 U.S. Dist. LEXIS 13749 (W.D. Wash.
  Jan. 25, 2024)...................................................................................33, 38

*Peterson v. Hewlett Packard Co.*,
  358 F.3d 599 (9th Cir. 2004) ................................................................ 22, 25

*Robinson v. Children's Hosp. Bos.*,
  No. cv 14-10263-djc, 2016 WL 1337255 (D. Mass. Apr. 5, 2016) ............40, 41

*Suarez v. State*,
  No. 101386-8, 2024 Wash. LEXIS 372 (July 25, 2024) ...................................40

*Suarez v. State*,
  No. 101386-8, 2024 WL 3529677 (Wash. July 25, 2024) ...............................24

*Tiano v. Dillard Dep't Stores, Inc.*,
  139 F.3d 679 (9th Cir. 1998) ...............................................................30

*Trans World Airlines Inc v. Hardison*,
  432 U.S. 63 (1977)..............................................................................26

*Villiarimo v. Aloha Island Air, Inc.*,
  281 F.3d 1054 (9th Cir. 2002) ...............................................................22

*We The Patriots USA, Inc. v. Hochul*,
  17 F.4th 266 (2d Cir.), opinion clarified, 17 F.4th 368 (2d Cir.
  2021) ...............................................................................................39

*Withey v. Fed. Bureau of Investigation*,
  477 F. Supp. 3d 1167 (W.D. Wash. 2020) .....................................................23

*Zimmerman v. PeaceHealth*,
  701 F. Supp.3d 1099 (W.D. Wash. Nov. 9, 2023) ...............................32, 35, 36

**Statutes**

28 U.S.C. § 1291 ..................................................................................27

42 U.S.C. § 2000e-2(a)(1) ....................................................................24

42 U.S.C. § 2000e(j) .................................................................24, 25, 31

Americans with Disabilities Act ......................................................27, 31

RCW § 49.60.180 ................................................................................24

Rehabilitation Act .............................................................................27, 31

**Other Authorities**

ER 105 ..............................................................................................3, 17

ER 302 ............................................................................................19, 28

ER 408 ................................................................................................33

ER 601 ................................................................................................10

ER 602 ..............................................................................................9, 10

ER 603 ..............................................................................................9, 10

ER 604 ........................................................................................11, 13, 35

ER 605 ............................................................................................13, 35

Fed. R. Civ. P. 7.1 ................................................................................1

Fed. R. Civ. P. 56(a) ............................................................................22

Fed. R. Civ. P. 56(c)(1) ........................................................................23

Rule 12(b)(6) ......................................................................................36

Rule 28-2 ..............................................................................................1

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. Civ. P. 7.1 and LCR 7.1, Appellee Northwest Acute Care Specialists represents that it is a corporation, and that no parent company or public company owns 10% or more of its stock.

## JURISDICTIONAL STATEMENT

Appellee Northwest Acute Care Specialists is not dissatisfied with Appellant's jurisdictional statement. CTA9 Rule 28-2.

## ISSUE PRESENTED

Did the District Court correctly dismiss Appellant's disability discrimination claims because it was an undue hardship to allow Appellant to work unvaccinated where, during the height of the COVID-19 pandemic, Appellant's job at the hospital required direct contact with patients and health care workers, and where the State of Washington mandated that healthcare workers be vaccinated?

## STATEMENT OF CASE

### A.        Factual Overview

Appellant Toby Higa ("Higa") was placed by Northwest Acute Care Specialist ("NACS"), a medical staffing agency, to work for Legacy Health ("Legacy") at the Salmon Creek Medical Center in Vancouver, Washington performing patient care and interacting with patients and other health care workers on a daily basis.

1

In the summer of 2021, healthcare systems nationwide were navigating the deadliest wave of the COVID-19 pandemic. COVID-19 vaccines had been approved and were considered by experts to be the most effective tool to protect against COVID-19. Legacy instituted a policy requiring that employees be fully vaccinated against COVID-19.

Higa requested a religious exemption from the vaccination policy. However, Higa worked in a position that could not be performed remotely. In seeking an exemption, Higa requested that he be allowed to continue patient care and interact directly with patients, families and other Legacy workers and staff while unvaccinated. Legacy denied the request to be allowed to work in such conditions unvaccinated. Higa claims that this decision was religious discrimination. Higa further claims that Northwest Acute Care Specialists, the medical staffing agency that placed him at Legacy's facility, discriminated against him by denying his request to work unvaccinated as a physician assistant.

The District Court correctly granted summary judgment to Legacy and NACS because accommodating Higa's request to work unvaccinated would have presented an undue hardship. The District Court relied on (i) undisputed scientific evidence showing that vaccinating workers was the best means available to address the pandemic; and (ii) the fact that the State of Washington mandated that healthcare providers be vaccinated against COVID-19.

2

### B. Higa Was Hired to Provide Direct Medical Care to Patients

Legacy is a regional non-profit healthcare system operating eight hospitals and over seventy clinics in Oregon and Washington. 3 ER 416; 4 ER 714. Legacy had approximately 14,000 employees and 3,000 allied health care providers. 3 ER 416. Legacy's mission is to provide exemplary health care and serve as a leader among Pacific Northwest healthcare providers. 2 ER 289. Higa was hired by NACS, a medical staffing agency, in September 2018 and was contracted to work as an emergency department physician assistant at Legacy's Salmon Creek Medical Center in Vancouver, Washington. 2 ER 11; 2 ER 26; 2 ER 105; 2 ER 268; 4 ER 490. During the time period in question, NACS did not control who, among the staff, could work and not work at Legacy's Medical Center, nor did NACS have control over Legacy's policies and requirements for employees working on-site at Legacy. 2 ER 26; 2 ER 38; 2 ER 67-68; 4 ER 506-571. Higa's job responsibilities, as a physician assistant in the emergency department, required continuous and close in-person contact with patients and other healthcare providers, including physical contact with patients to provide care. 2 ER 11; 2 ER 105-106; 2 ER 269; 4 ER 489-493; 4 ER 499-500. Higa himself admitted that he could not perform his job duties without having in-person contact with patients. 4 ER 573. Because of this, the District Court correctly found that he "worked in [a] role[] that required [him] to either perform patient care or interact with patients and other health care workers on

3

a daily basis." 2 ER 6. No where in Higa's appeal to this Court does he argue that this finding was incorrect. *See generally* Appellants' Opening Brief, Dkt Entry 13 ("Appeal Brief").

**C. Legacy Initially Adapted Policies in Response to the COVID-19 Pandemic Short of a Vaccine Mandate and These Failed to Stop the Spread of the Virus**

Dr. Seth Cohen has over 15 years of experience in epidemiology, internal medicine and infectious diseases, currently serves as the Medical Director of Infection Prevention at the University of Washington Medical Center, and is a Clinical Associate Professor at the University of Washington (his CV is available at 4 ER 607-616). According to Dr. Cohen, COVID-19 is an easily transmitted disease, spread primarily through person-to-person contact when an infected individual breathes out respiratory aerosols containing viral particles; the disease is particularly dangerous to the elderly and hospitalized individuals with preexisting comorbidities. 4 ER 594-598. The disease was first reported in late 2019 in Wuhan, China and by March of 2020, the World Health Organization declared the COVID-19 outbreak a pandemic and the virus reached Washington State, including Legacy's facilities. 4 ER 714-715. COVID-19 presented unique challenges to healthcare systems because it could be easily transmitted, infected individuals might be asymptomatic, it presented higher than normal risks of death to individual patients at Legacy's

4

facilities, and health care workers were at high risk of COVID-19 infection and spreading. 4 ER 594-598, 714-715.

As noted by Dr. Melinda Muller, (CV at 3 ER 429-439), who was a member of the Senior Leadership Team at Legacy during the relevant time frame, "the onset of the COVID-19 pandemic in early 2020 represented an unprecedented challenge for the Legacy system, along with its valued providers, patients, and the communities it serves." 3 ER 416. In addition to the reality of the social costs and other strain placed on Legacy by COVID-19, Dr. Muller recounts that Legacy's facilities were continuously at capacity and that "the pandemic had a significant impact on Legacy's providers. Provider use of sick time was significantly higher than normal during the pandemic, with hundreds of providers often out sick or on work restrictions at any given time" which further impacted Legacy's ability to provide patient care during this critical time. 3 ER 417. Dr. Muller notes that in navigating these challenges, "Legacy strived to rely on scientific consensus, agency guidance . . . and the expertise of its own internal clinical leaders when implementing various COVID-19 related policies and procedures." 3 ER 416.

Ultimately, Legacy had to adapt its facilities and policies in order to ensure that it provided the safest possible environment for patients and providers and maintained the public's trust during a major global event, such as suspending elective and nonemergency surgeries to protect vulnerable patients and staff while

treating an influx of COVID-19 patients. 2 ER 8; 3 ER 416-417. These adaptations included, among other things, the required use of personal protective equipment (PPE), COVID-19 testing, temperature checks, social distancing, environment disinfection, room air changes, daily meetings to discuss health and safety, and new written updates regarding the workforce and changes in pandemic conditions (including weekly and bi-monthly newsletters to staff and leadership), hand hygiene requirements, and required self-reporting of illness and symptoms. 2 ER 8; 3 ER 417-418; 3 ER 440-460; 4 ER 716-717. For example, in looking at the news letters sent to staff and leadership regarding COVID-19, samples show tracking of COVID-19 positive patients, daily regional status of positive COVID-19 tests and related deaths, along with updates related to staffing, policy updates and more which were aimed at helping educate providers on the risks and best practices related to COVID-19 care. 3 ER 440-470.

However, as noted by Dr. Muller, while these "control measures represented the best tools available at the time, each had limitations. For example, one of the major drawbacks of PPE is that is must be worn properly, and at all times, to be effective. At Legacy, break rooms were a major concern because providers would eat without masks or congregate without masking. Furthermore, there was also no way for Legacy (nor would it have been practical) to require that providers mask while they were not at work." 3 ER 417.

6

Notwithstanding best efforts, COVID-19 related hospitalizations and deaths continued to grow and Legacy was using refrigerated semi-truck trailers as temporary, overflow morgues for deceased patients. 4 ER 717.

The COVID-19 vaccine from Pfizer was initially authorized on December 11, 2020 followed by the Moderna vaccine on December 18, 2020. Both were shown to have an efficacy in preventing COVID in 94.5-95% of cases with no specific safety concerns. 4 ER 599. According to Dr. Cohen, both vaccines had substantial ability to "prevent severe infection, hospitalization and death and also confer the benefit of protections against long COVID, including specifically among a cohort of healthcare personnel." 4 ER 600. Thus, high vaccination rates "also have the benefit of reducing overall transmission risk. This is in part because people who are vaccinated are less likely to become infected in the first place" 4 ER 600. Thus "[i]n a highly vaccinated workforce, if fewer healthcare personnel are infected and those who are infected are less contagious, it follows that there is an overall lower risk of transmission to patients." 4 ER 600.

Thus, in December of 2020, when Legacy received its first of many shipments of the COVID-19 vaccine, Legacy immediately distributed the vaccine to workers who volunteered for it, prioritizing employees who worked in high exposure areas. 3 ER 418-419. In doing so, Legacy began holding town halls to educate its workers about the vaccine and established a hotline for vaccine questions including providing

7

information about both logistics and the safety of the vaccine. 2 ER 9; 3 ER 417-418. By March 4, 2021, most of Legacy's employees and older patients were vaccinated – at Salmon Creek, where Higa worked, 1,700 providers and older residents had been vaccinated. 2 ER 9; 3 ER 417-419; 4 ER 717-718. Yet, as noted by Dr. Muller "despite the widespread availability of vaccines to any provider who wanted one, it appeared that a significant portion of the provider population did not intend to get vaccinated." 3 ER 420.

Thus, Legacy increased its efforts to encourage voluntary provider vaccination including, among other things, providing incentivized sick pay for employees who were fully vaccinated. 3 ER 420. On July 1, 2021, however, about 16% of Legacy's employees - approximately 2,240 - remained unvaccinated. 2 ER 9; 3 ER 420.

Then, in June through September of 2021, COVID-19 cases "skyrocketed by 1200%" according to Dr. Cohen. The spread of the more transmissible and severe Delta variant of COVID-19 led to a 600% increase in hospital admissions and daily death rates of 1,500 Americans. 2 ER 9-10; 2 ER 286; 2 ER 288; 3 ER 421; 4 ER 596-603. Dr. Cohen notes that the Delta variant "was not only more transmissible, but also associated with a significantly higher risk of severe disease and hospitalization." 4 ER 597. Forecasts, including an Oregon statewide publicly available COVID-19 prediction model, and Legacy's own internal metrics,

8

anticipated that COVID-19 cases would significantly increase even further – dwarfing anything experienced during the pandemic up until that point. 3 ER 421. These predictions ultimately held true as in the winter of 2021, this number rose to over 4,000 Americans dying per day due to COVID-19. 4 ER 603. "By December 15, 2021, 1 out of every 100 persons in the US above age 65 had died from COVID 19; the US death toll was greater than 800,000 since the start of the pandemic." 4 ER 603. According to Dr. Cohen "[i]t is incontrovertible that COVID-19 posed a threat to patients and healthcare workers during this timeframe." 4 ER 602. In looking at this threat, unvaccinated individuals were far more likely to be impacted; for example, a CDC study during the Delta surge showed that people who were unvaccinated were three times (300%) more likely to be infected with COVID-19 compared to those who were fully vaccinated, regardless of age, race and ethnicity. 4 ER 594-605.

Because of this, Legacy's leadership team began implementing further safety measures in anticipation of the coming surge including visitor restrictions, but there was a strong consensus among the leadership team at Legacy that those efforts, along with the safety measures that Legacy providers had taken throughout the pandemic, would not be enough given the gravity of what Legacy and other health care systems were facing. 3 ER 422. Leadership was mindful that many healthcare organizations

9

across the country had begun requiring employees to be vaccinated against COVID-19. 3 ER 416-421.

According to Dr. Cohen, "robust" studies by the CDC and others that "have held up in multiple real world studies across large cohorts" continued to show that "vaccination . . . retained efficacy against severe disease and hospitalization through the emergence of all variants of concern . . . primarily Delta[]." 4 ER 601. For example, a CDC study involving healthcare personnel across 8 states between December 2020 and August 2021 showed a vaccine effectiveness of 80% in preventing infection. 4 ER 601. At the same time, "low vaccination rates in healthcare were linked to higher rates of preventable COVID-19 and subsequent outbreaks." 4 ER 602. Thus, according to Dr. Cohen "[m]andatory COVID-19 vaccination policies were essential to protecting employees and patients at healthcare facilities." 4 ER 603. "It is estimated that by the end of June 2021, COVID-19 vaccines prevented 279,000 deaths and 1.25 million hospitalizations in the United States." 4 ER 603.

Thus, Dr. Muller (whose CV is at 3 ER 429-439) and the rest of the Senior Leadership Team focused on the importance of vaccination against COVID-19 as a necessary tool for Legacy to use to combat the predicted surge in the pandemic. 2 ER 10; 2 ER 285-286; 3 ER 421-422.

> **D.** **Legacy Mandated All Employees Be Vaccinated Based on the Weight of Scientific and Medical Evidence Showing that the**

**Vaccine Was a Necessary Measure of Protection Against COVID-19**

On August 5, 2021, Legacy announced that all physicians, credentialed medical staff (directly employed or contracted), nurses and any others who conducted business or performed services within Legacy locations would need to, in addition to following all the previously set policies (such as wearing PPE) be fully vaccinated – or have received approval for an exemption – by September 30, 2021. 2 ER 10; 2 ER 29; 2 ER 67-68; 2 ER 107; 2 ER 269; 3 ER 422-423; 3 ER 461-463. This policy was in recognition that Legacy had a steadfast responsibility to provide the safest care possible for its patients, some of whom are so vulnerable that, in the words of Dr. Cohen, it is "difficult to imagine a health care system permitting even a single unvaccinated healthcare worker to provide direct patient care" to them "at one of the heights of the COVID-19 pandemic with a highly pathogenic variant." 4 ER 604.

Vaccination policies for health and safety were not new to Legacy; Legacy had previously implemented policies regarding other vaccines, such as the flu vaccine. 3 ER 422. However, Legacy was mindful that the COVID-19 vaccine, as Dr. Muller put it "presented a unique challenge" and thus the decision to enact the vaccination policy was not made lightly. 3 ER 422. Before the policy was announced "multiple internal stakeholders, including experts in infectious diseases and infection control, worked with the [Senior Leadership Team] on the development and

11

implementation of the policy, along with Legacy leaders in the Human Resources, Employee Health, Ethics, Operations, Compliance and Legal Department." 3 ER 422-423. According to Dr. Muller this decision was based on the scientific consensus at the time that:

> i. The available vaccines were safe and highly effective at preventing infection and reducing cases of severe illness and death;
> ii. Vaccinated individuals tended to carry a lower viral load and were thus less likely to spread COVID-19 than unvaccinated individuals;
> iii. While other safety measures, including PPE, testing, and hygiene protocols, were an important part of the control process, vaccination against COVID-19 provided all of the benefits – with none of the limitations – of the other safety measures.
> iv. COVID-19 represented a particularly grave threat to Legacy's patient population, many of whom were particularly susceptible to severe illness and death due to their age and/or pre-existing medical conditions;
> v. The Delta variant was spreading quickly and predicted to place additional stress on Legacy's already overburdened system;
> vi. Legacy had a responsibility to provide the highest possible level of patient care and to protect patients, providers, and visitors from unreasonable safety risks;
> vii. Legacy needed to maintain adequate staffing levels to provide high-quality patient care, and would be less likely to do so if providers were out ill with COVID-19 (which, among other consequences, could result in providers working longer hours or taking additional shifts); and
> viii. As a major regional healthcare system, Legacy was committed to ensuring that members of the public felt safe accessing medical care at its facilities and believed that ensuring all providers were fully vaccinated would help foster that trust.

3 ER 423-424; *see also*, 4 ER 599-605; 3 ER 417; 4 ER 715-718. Thus, vaccination was a critical complement to, not a replacement for, the other precautionary measures already in effect at Legacy's hospitals before this requirement was put into place; allowing workers to continue to utilize only the prior precautionary measures,

12

and not also the vaccine, would endanger others. Allowing unvaccinated workers to continue contact with patients would have posed risks of those workers getting infected and spreading COVID-19 further during a period when COVID-19 hospitalizations and deaths were at an all-time high. 2 ER 18; 3 ER 417-423; 4 ER 594-605.

Indeed, as noted by Dr. Cohen, vaccination was the "single most effective tool available for mitigating the spread" of COVID-19 and there was "no effective alternative to vaccination in a healthcare setting". 4 ER 604. "Complimentary measures to vaccination include testing, use of personal protective equipment, staying home while sick and social distancing. While these are all highly effective, these were not a substitute for vaccination in the healthcare. All are subject to suboptimal adherence in a work environment struggling with pandemic related critical staffing shortages and high levels of burnout." 4 ER 604-605. Further "ready access to testing . . is not a sufficient replacement for vaccination" either because "testing is not perfectly accurate" and "turn around times for diagnostic testing are quite variable and may lead to significant delays in obtaining actionable results." 4 ER 605. "Established sick leave policies . . . is another complimentary measures" but "due to the possibility of asymptomatic or pre symptomatic transmission" it is not a substitute for vaccination either. 4 ER 605. Ultimately, because vaccines "have

13

the benefit of stimulating the immune system without interruption, regardless of setting" it is the most effective tool. 4 ER 605-606.

Legacy's policy allowed for exemptions based on "narrow, evidence based, bona fide religious and/or medical conflicts with the vaccine" 3 ER 461-463. Based on that exemption, Legacy established a process for reviewing and approving vaccine exemption requests, evaluating whether on-site employees could be accommodated with exemptions or could do their job without encountering employees or patients. 3 ER 461-463. In looking at ensuring those requesting accommodations were not going to have contact with employees or patients, Legacy "was cognizant of the fact that transmissions were still occurring even as Legacy took all appropriate steps to prevent them" and thus, as stated by Dr. Muller "we believed that allowing even a single unvaccinated worker to come into contact with patients or other providers would increase the risk of patient and provider infections, provider absences, or lead to other undesirable consequences." 3 ER 425.

On August 9, 2021, within days of Legacy's vaccination policy being announced, the State of Washington announced a statewide requirement for all healthcare providers to be vaccinated by October 18, 2021. 2 ER 129-141. According of the office of Governor Jay Inslee, COVID -19 posed a "high risk" to "our most vulnerable populations and our health care system" such that if it was left unchecked it could "overwhelm portions of Washington's public and private-health

14

care system" according to "health professionals and epidemiological modeling experts." 2 ER 129. The Proclamation noted a reason for enacting this measure was "the emergence of highly contagious COVID-19 variants, including the 'Delta' variant that is at least twice as transmissible as the virus that emerged in late 2019, coupled with the continued significant numbers of unvaccinated people, have caused COVID-19 cases and hospitalizations to rise sharply." 2 ER 129. Based on these concerns, the Proclamation was made requiring vaccination because "COVID-19 vaccines are effective in reducing infection and serious disease, and widespread vaccination is the primary means we have as a state to protect everyone" and "to protect our health care system, to avoid the return of stringent public health measures and to put the pandemic behind us." 2 ER 130.

The Proclamation also stated that "it is the duty of every employer to protect the health and safety of employees by establishing and maintaining a healthy and safe work environment and by requiring all employees to comply with health and safety measures." 2 ER 131. Based on this, the Proclamation prohibited "[a]ny Health Care Provider from failing to be fully vaccinated against COVID-19 after October 18, 2021" and also prohibited "[a]ny operator of a Health Care Setting from permitting a Health Care Provider to engage in work for the operator as an employee, contractor or volunteer in their capacity as a Health Care Provider after October 18, 2021 if the Health Care Provider has not been fully vaccinated against COVID-19."

15

2 ER 132-133. And, similar to Legacy's policy, Washington's Proclamation allowed for vaccination exemptions based on disability-related and sincerely held religious belief accommodations absent undue hardship. 2 ER 133-134.

### E. The Vaccination Policy Ultimately Helped Legacy Combat the Surge in COVID Related Hospitalizations

In the weeks following both Legacy's and the State's vaccine mandates, data showed significant spikes in hospitalization and care needs related to COVID-19, just as Legacy's and other models had predicted. 3 ER 425-426. ICU admissions at Legacy peaked in September of 2021 and nearly 200 COVID-19 positive patients were receiving care at Legacy's facilities – a dramatic increase from previous highs. 3 ER 426. Many of those coming in for treatment were unvaccinated individuals – approximately 90% of COVID-19 patients on a ventilator were unvaccinated and 91% of patients in the ICU for COVID-19 were unvaccinated. 3 ER 425-426. Yet, by October of 2021, 96% of Legacy's employees were fully vaccinated. 3 ER 426.

### F. Higa Requested an Exemption to the COVID-19 Vaccine, But Was Ultimately Vaccinated and Returned to Work Full Time

After Legacy announced its COVID-19 vaccination policy in August of 2021 Higa applied for exemptions from vaccination. 2 ER 12; 2 ER 67-69; 2 ER 74-79; 2 ER 107-109; 2 ER 150-151. Higa was granted a religious exemption from the COVID-19 vaccine (2 ER 153, 3 ER 331) and was later placed on unpaid administrative leave starting on October 17, 2021, because, as an unvaccinated

worker, he could not work in a patient-facing position. 2 ER 69; 2 ER 81-90; 2 ER 122; 2 ER 165-174. This was because Legacy determined that despite the vaccination policy, transmissions were still occurring at Legacy – thus, allowing even a single unvaccinated worker to come into contact with patients or other providers would increase the risk of patient and provider infections, provider absences, or lead to other undesirable consequences that hindered Legacy's ability to provide the safest possible environment. 3 ER 425.

Following his request for an exemption, NACS communicated with Higa regarding his requested accommodations, searched for an alternative non-patient position for Higa with Legacy or a different company, and asked Higa for his input on a possible accommodation that would allow him to continue working while unvaccinated. 2 ER 27; 2 ER 70l 2 ER 121; 2 ER 264-265; 3 ER 424-425; 4 ER 497-498. Higa, however, chose to vaccinate and returned to his normal work duties at Salmon Creek on October 30, 2021 (16 days after he was placed on administrative leave) with the same privileges, pay and terms of employment as before. 2 ER 12; 2 ER 105; 2 ER 126-127; 2 ER 265; 2 ER 272; 4 ER 637.

### G. Higa Filed A Claim of Religious Discrimination and the District Court Granted Summary Judgment in Favor of Legacy and NACS Based on Undue Hardship

Although Higa was able to return to work, he later filed a lawsuit against both Legacy and NACS alleging that, under both Washington and Federal law, these two

17

companies discriminated against him by failing to accommodation him by allowing him to work unvaccinated; his case was later consolidated with the lawsuits filed by the other Appellants in this case. 2 ER 13. Legacy then moved for summary judgment on May 31, 2024 and Appellants opposed. *Id*. NACS joined the motion and, on July 10, 2024, also moved for summary judgment. *Id*.

Legacy's motion for summary judgment included abundant evidence that there was a consensus of credible scientific research in 2021 that COVID-19 vaccines were effective at significantly reducing COVID-19 infection and transmission through two qualified medical experts, Dr. Cohen and Dr. Muller, based on substantial peer-reviewed scientific research; and that COVID-19 vaccines were not only effective, but that they were the single most important tool available for protecting against COVID-19 above and apart from other measures. Based on this evidence, Legacy argued that having an unvaccinated employee onsite with patients presented an unreasonable health and safety risk to Legacy's patients, and their business in light of the recent surge in COVID-19 cases due to the Delta variant, and given the State of Washington's requirement that health care workers be vaccinated.

In responding to Legacy and NACS' motions for summary judgment, Higa did not challenge or dispute any of the facts Legacy submitted regarding COVID-19, the vaccine's effectiveness, or the risks inherent to the health care system. *See* 2

18

ER 41-56 (Response in Opposition to NACS Motion for Summary Judgment); 3 ER

302 (Response in Opposition to Legacy's Motion for Summary Judgment). For

example, Higa did not dispute that COVID-19 is contagious and can cause severe

outcomes, including hospitalization, long COVID, and death. Higa did not dispute

that he came routinely into close physical contact with patients, patients' families,

and other providers and staff. Higa did not dispute that masking, testing, social

distancing, and similar protective measures are imperfect controls in protecting

against COVID-19 and are subject to human error. Higa did not dispute that Legacy

has a responsibility to provide the highest possible level of patient care and to protect

patients, employees and visitors from unreasonable safety risks. Higa did not dispute

that Legacy needed to maintain adequate staffing levels to provide high-quality

patient care, and would be unable to do so if employees were out ill with COVID-

19. Higa did not dispute that COVID-19 vaccines significantly reduced severe and

critical outcomes of COVID-19, or that COVID-19 vaccines reduce the length of

time in which one is ill with COVID-19.

Accordingly, the District Court granted summary judgment to Legacy finding

that "any accommodation that allowed Higa to continue working with patients would

have imposed an undue hardship on Legacy", 2 ER 20, and thus granted summary

judgment in favor of both Legacy and NACS. In doing so, the District Court stated

that: "Legacy has provided – with specificity – the limitations of the health and

19

safety protocols in place before the availability of the COVID-19 vaccines (which are the same precautions Plaintiffs assert could have been used to accommodate their religious beliefs and allow them to work while unvaccinated)." 2 ER 17. And the District Court found that the Appellants, including Higa, "fail to point with any specificity to evidence from which a jury could reject Legacy's assertions" and that the Appellants "ignore the voluminous testimony and other evidence Legacy has provided at summary judgment." 2 ER 18. Thus the District Court "decline[d] to piece together a case on [Appellants'] behalf where they have not cited evidence in support of their arguments." 2 ER 20. Accordingly, the District Court found that "no reasonable jury could find against Legacy's undue hardship defense. The Court therefore grants summary judgment in favor of Legacy as to [Appellants'] claims of failure-to-accommodate under Title VII and the WLAD." 2 ER 20.

## ARGUMENT

### A.    Summary of Arguments

This Court should affirm the District Court decision because the evidence submitted to the District Court showed clearly that it would have been an undue burden to accommodate Higa by allowing him to work in a patient facing role without being vaccinated. During summary judgment proceedings before the District Court, Legacy submitted significant volumes of evidence showing that the COVID-19 vaccine was a necessary, independent part of the health care industry's response

20

to the COVID-19 pandemic and that the vaccine was the single most effective tool in combatting COVID-19; and that any worker that was not vaccinated posed significant social, health and safety risks. Legacy's evidence showed that, beyond risks to health and safety, it would have incurred significant financial costs in accommodating Higa as an unvaccinated employee. Higa, in response, cited and submitted no materials that rebutted this evidence and instead argued that Legacy failed to put forth evidence in support of that conclusion. The District Court properly found that Higa was wrong, and granted summary judgment to Legacy, and NACS, based on the evidence showing the significant social, health, safety, and financial costs that granting Higa his requested accommodation would have posed.

On appeal, Higa tries to reframe the issues and advances an argument that he did not submit to the District Court regarding alternative accommodations that should have been considered. This argument is not properly before the Court both because Higa did not make this argument to the District Court, and because the District Court did not rule on these arguments. Thus, this Court should not consider them.

However, ultimately, this Court can and should uphold the grant of summary judgment in this case because Legacy and NACS have shown that allowing Higa to continue working in a patient facing role during a global pandemic when he was not vaccinated would have been an undue burden; and that there were no possible

21

alternative accommodations available at that time as there were no other non-patient facing positions available for Higa.

### B. This Court Reviews the Decision to Grant Summary Judgment De Novo

The Ninth Circuit reviews a District Court's order granting summary judgment de novo. *Peterson v. Hewlett Packard Co.*, 358 F.3d 599, 602 (9th Cir. 2004). This is a non-deferential standard of review. *Kunin v. Benefit Tr. Life Ins. Co.*, 910 F.2d 534, 537 (9th Cir. 1990).

### C. Summary Judgment Is Proper Where There Is No Genuine Issue of Material Fact

"The Court shall grant summary judgment if the movant shows there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Koepke v. Fonteechhio*, 177 F.2d 125, 127 (9th Cir. 1949). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).

The moving party bears the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to come forward with "specific facts showing that

22

there is a genuine issue for trial." *Withey v. Fed. Bureau of Investigation*, 477 F. Supp. 3d 1167, 1171 (W.D. Wash. 2020).

When the moving party, as here, is a defendant – he bears the burden of proof at summary judgment with respect to any affirmative defense. *Clark v. Capital Credit & Coll. Servs.*, 460 F.3d 1162, 1177 (9th Cir. 2006); *see also*, *Intel. Perip. Dev. Inc. v. SmartPad Inc.*, No. C95-4479-FMS, 1998 WL 75406, at *2 (N.D. Cal. Oct. 26, 1998). It is the nonmoving party's job to identify with reasonable particularly the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). In doing so, the nonmoving party must create "more than . . . some metaphysical doubt as to the material facts" but must actually establish a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To do so the nonmoving party must "cit[e] to particular parts of materials in the records, including depositions, documents, . . . or declaration" or otherwise "showing that the materials cited do not establish the absence . . . of a genuine dispute" Fed. R. Civ. P. 56(c)(1). Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Withey*, 477 F. Supp. 3d at 1171.

Here, there was no dispute as to any material fact regarding the circumstances of Higa's request for accommodation, nor Legacy's response thereto; thus, the

23

District Court's granting of summary judgment in this matter is entirely proper and the lower court's decision should be affirmed on appeal.

### D. Allowing Higa to Work In-Person Would Have Posed An Undue Hardship

Under Title VII and the WLAD, it is unlawful for an employer to discharge an individual or to otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of that individual's sincerely held religious beliefs. 42 U.S.C. § 2000e-2(a)(1); RCW § 49.60.180. An employer must "reasonably accommodate" an employee's religious practice unless such an accommodation would impose an "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j); *see also, Suarez v. State,* No. 101386-8, 2024 WL 3529677 (Wash. July 25, 2024); *Kumar v. Gate Gourmet, Inc.*, 180 Wash. 2d 481, 501, 325 P.3d 193, 203 (Wash. 2015). Both the WLAD and Title VII claims for failure to accommodate a religious belief entail substantially similar elements, and thus courts typically analyze these claims together. *Kumar*, 325 P. 3d at 203.

To prove their failure to accommodate claim under both Title VII and the WLAD, plaintiffs "must [show] that (1) [they] had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) [they] informed [their] employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected [them] to an adverse employment action because of [their]

inability to fill the job requirement." *Peterson,* 358 F.3d at 606. "Once an employer establishes a prima facie case of failure to accommodate religious beliefs, the burden shifts to the employer to show 'either that it initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship.'" *Bolden-Hardge v. Off. Of Cal. State Controller*, 63 F. 4th 1215, 1224 (9th Cir. 2023); U.S.C. § 2000e(j).

As decided by the Supreme Court in 2023, to establish that a particular accommodation would impose an undue hardship, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff v. DeJoy*, 600 U.S. 447, 470 (2023). Courts must "take[] into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [an] employer." *Id* at 470-471. Higa's Brief spends significant time seeking to distinguish between the prior standard for undue hardship, and what the *Groff* decided in 2023 – however, Title VII decisions issued before *Groff* remain persuasive because *Groff* did not materially change the analysis in undue hardship cases. Rather, the Supreme Court in *Groff* clarified its previous opinion in *Trans World Airlines Inc v. Hardison*, 432 U.S. 63, 84 (1977) which stated that to "require [an employer] to bear more than a de minimis cost" to provide

25

religious accommodation "is an undue hardship." The *Groff* Court noted that "*Hardison* cannot be reduced to that one phrase" and instructed that when evaluating whether a hardship is "either more than de minimis" or "substantial", courts should continue to examine how an asserted burden affects "the conduct of [the employer's] particular business." 600 U.S. at 468-71.

Ultimately, "[w]hat constitutes undue hardship must be determined within the particular factual context of each case." *Balient v. Carson City*, 180 F.3d 1047, 1053-54 (9th Cir. 1999). "Costs" are not limited to financial expenditures and also encompass an "accommodation's effects in co-workers" which "may have ramifications for the conduct of the employer's business." *Groff,* 600 U.S. at 472. "Costs" thus may include not only a "hardship on the plaintiff's coworkers", but also an increase in safety and liability hazards in the workplace. *Opuku-Boateng v. California*, 95 F.3d 1461, 1469 (9th Cir. 1996). Further examples of costs recognized by Courts under the undue hardship standard for religious accommodations include increased costs from increased infections, health problems, deaths, and substantial strain or interruption to a business. *Bhatia v. Chevron U.S.A. Inc.*, 734 F.2d 1382, 1383-84 (9th Cir. 1984); *Bordeaux v. Lions Gate Ent., Inc.*, No. 2:22-cv-04244-scw-pla, 2023 WL 81008655, *13-14 (C.D. Cal. Nov. 21, 2023); *Dennision v. Bon Secours Charity Health Sys. Med. Grp., P.C.*, No. 22-cd-2929 (CS), 2023 WL 3467143, *n7 (S.D.NY. May 15, 2023); *Beickert v. N.Y.C. Dep't of Ed.*, No. 22-cv-

26

5265(dli)(vms), 2023 WL 6214236, *5 (E.D.N.Y. Sept. 25, 2023); EEOC, *What you Should Know about COVID-19 and the ADA, the Rehabilitation Act, and other EEO Laws*, *Sec. L.3-L.5 (Mar. 1, 2022), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws.

### 1. Higa's Arguments on Appeal Regarding Consideration of Alternative Accommodations Fail Procedurally and Substantially

On appeal, Higa raises for the first time new arguments regarding the fact that, as he alleges it, Legacy and NACS had a duty to consider alternative accommodations beyond his requested accommodation of being able to work in his prior position unvaccinated. However, these arguments are not properly before this Court of Appeals; and, even if they were, this Court should still affirm summary judgment in favor of NACS because NACS did consider alternative options including exploring what other positions Higa could potentially work in, and ultimately Higa was granted a reasonable accommodation of unpaid leave.

### (a) The District Court Did Not Rule That Legacy, or NACS, Failed to Consider Alternative Accommodations and Thus This Argument Is Procedurally Improper on Appeal

Under 28 U.S.C. § 1291, this Court acquires jurisdiction over "all final decisions of the district courts". Furthermore, in reviewing a District Court's order, the Appellate Court generally will not consider arguments raised for the first time on appeal. *Momox-Caselis v. Donohue*, 987 F.3d 835, 841 (9th Cir. 2021). This rule is subject to three exceptions: "(1) there are exceptional circumstances why the issue

27

was not raised in the trial court; (2) the new issue arises while the appeal is pending because of a change in the law; or (3) the issue presented is a pure question of law and the opposing party will suffer no prejudice as a result of the failure to raise the issue in the trial court." *Id* at 841-842.

Here, Higa argues that Legacy and NACS failed to undertake good faith efforts to find alternative accommodations. *See* Appeal Brief at 17-21. However, this argument was not raised to the District Court and thus the District Court did not rule on this argument at summary judgment. *See* 2 ER 41-56 (Higa's Response in Opposition to NACS Motion for Summary Judgment); 3 ER 302 (Higa's Response in Opposition to Legacy's Motion for Summary Judgment). Indeed, as noted by the District Court in its grant of summary judgment - Higa's arguments to the District Court dealt with the fact that Legacy could have allowed him to continue working in a patient facing role in the emergency department using only PPE and other measures (as Legacy had prior to the vaccine mandate) to stop the spread of COVID-19. 2 ER 18-19. However, this argument fails to actually address Legacy's primary arguments that these measures were insufficient, and without marshaling any evidence to rebut Legacy's significant amounts of evidence that the COVID-19 vaccine was a necessary measure above and apart from these prior measures. 2 ER 18-19 ("Plaintiffs fundamentally mischaracterize Legacy's argument. Legacy does not assert in its undue hardship analysis that non-vaccination-based safety protocols

28

were a burden that would result from accommodating Plaintiffs' vaccine exemption requests; instead, Legacy asserts that, even with those protocols, having unvaccinated staff interacting with patients and other staff through its healthcare system was itself as 'substantial' cost to its business of providing healthcare and upholding the health of its patients and staff" . . . "Plaintiffs provide no evidence to the contrary").

Higa offers no explanation for why this is being raised for the first time on appeal – he does not argue that exceptional circumstances justify it, that there are new issues or a change in the law, or that it is a pure question of law. *See* Appeal Brief at 17-21. This is because none of these exceptions apply, and thus, this issue is not properly before this Court of Appeals.

To the extent that any arguments even close to this were raised below it entailed briefing done regarding whether or not placing Higa on unpaid leave was an adverse employment action (which Higa now improperly attempts to reframe as arguments regarding if this use of leave was an appropriate, lesser accommodation). However, the District Court did not rule on this issue (i.e., if Legacy and NACS had failed to consider or offer Higa an alternative accommodation), stating that: "Separately, Plaintiff Higa asserts that Legacy inadequately accommodated his religious beliefs when it placed him on unpaid administrative leave. Legacy contends that Higa's placement on unpaid leave was not an adverse employment action. It is

29

unnecessary for the Court to address these arguments because given the evidence before the Court . . . any accommodation that allowed Higa to continue working with patients would have imposed an undue hardship on Legacy." 2 ER 20 (internal citations omitted). Accordingly, this issue is not properly before this Court to be considered as the District Court did not enter a final ruling on this issue. Thus, this Court should not consider Higa's arguments at pages 17-21 regarding whether or not Legacy, or NACS, considered other accommodations for Higa in this case.

> **(b)     Even If This Court Finds the Arguments Were Properly Before This Court, Substantially This Argument Fails Because NACS did Consider Alternative Accommodations**

Even if this Court of Appeals considers Higa's arguments regarding whether or not NACS considered alternative methods of accommodating him, it should still affirm the District Court. As a threshold issue, it is irrelevant whether Legacy and NACS even considered Higa's accommodations requests if they can show that these accommodations would have resulted in an undue hardship. *Tiano v. Dillard Dep't Stores, Inc.,* 139 F.3d 679, 681 (9th Cir. 1998) (to defend against a failure to accommodate claim, an employer must show "*either* that it initiated good faith efforts to accommodate reasonably the employee's religious practices *or* that it could not reasonably accommodate the employee without undue hardship") (emphasis added); *accord*, *Bolden-Harge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1224-1125 (9th Cir. 2023) (cited by Higa in Appeal Brief at page 18 and 19) (stating that

30

*a* defense to religious discrimination claims is to show "that [the employer] initiated good faith efforts to accommodate reasonably the employee's religious practices", but that an employer may instead show undue hardship). Higa cites no case law holding that the employer's lack of consideration of alternative options supersedes Title VII's provision that employers need not accommodate an employee's religious practice if doing so would impose an undue hardship. 42 U.S.C. § 2000e(j).[1]

However, in considering how to accommodate Higa's requested exemption, it is important to note that NACS did not have control over the policies and procedures that Legacy employed for employees working on-site at Legacy. 2 ER 26; 2 ER 277; 3 ER 328-329. Thus, NACS had no authority to allow Higa to work

---

[1] At page 18 of the Appeal Brief, Higa cites to the case of *Buckingham v. US*, 998 F.2d 735 (9th Cir. 1993) for the supposed proposition that under Title VII religious discrimination provisions, it is not enough to determine that it would be an undue hardship to accommodate the employee – however, this case deals with the Rehabilitation Act handicap accommodation provisions which are wholly different. *Groff*, 600 U.S. at 471 (Supreme Court declined to incorporate standards from disability laws, such as the Americans with Disabilities Act, into Title VII's religious accommodation framework). Moreover, this case deals with the issue of accommodating an employee who had contracted AIDS and determining if that employee, as an accommodation for his disability, could be allowed to transfer to a different facility where he would be closer to medical treatment despite provisions of the collective bargaining agreement which limited transfers. *Id* at 738. Although Higa deems this "an analogous context" (Appeal Brief at 18), he provides no justification for such where the case is distinct both legally (resting on the Rehabilitation Act and not Title VII) and factually (dealing with a transfer as accommodations for AIDS rather than a vaccine exemption as a religious accommodation).

at Legacy unvaccinated; and it would be impossible for NACS to try to provide this particular accommodation to Higa as it is based on a policy set by a wholly different entity. Accordingly, Higa's first requested accommodation – allowing him to continue to work at Legacy unvaccinated, would have posed an undue hardship on NACS and was impossible to grant.

However, Higa was instead granted the alternative accommodation of unpaid administrative leave. Unpaid leave is a reasonable accommodation for sincerely held religious beliefs. *Ansonia Bd. of Educ. V. Philbrook*, 479 U.S. 60, 68 (1986); *Nunes v. Wal-Mart Stores, Inc*., 164 F.3d 1243, 1247 (9th Cir. 1999). Although the Appeal Brief at 20-21 argues that unpaid leave is not a reasonable accommodation when it is involuntary or unpaid, the very case Higa cites for this proposition acknowledges that involuntary, unpaid leave can be a reasonable accommodation *if* other accommodations (such as allowing the employee to continue working in their current, or an alternative position) are unavailable. *See Zimmerman v. PeaceHealth*, 701 F. Supp.3d 1099, 1110 (W.D. Wash. Nov. 9, 2023) (cited in Appeal Brief at 20-21).[2] Here, it was not possible for NACS to allow Higa to continue working in his

---

[2] The Appeal Brief at 21 also cites to a settlement reached from a Central District of California case, to which they cite to the following news article to show: https://socalrecord.com/stories/635328857-goleta-water-district-employees-win-125-000-settlement-over-covid-vaccine-mandate. First, this article does not state whether or not the settlement included the employer accepting liability for the allegations – thus the settlement here is being offered for improper purposes under (footnote continued)

32

current, patient-facing position, as Legacy prohibited such (and, as discussed below, doing so would have been an undue hardship for Legacy); and ultimately, NACS did explore other options to accommodate Higa – including searching for other positions he could fill (which Higa agrees would have been a reasonable accommodation if such a position existed, but no other positions were available at that time), and asking Higa for his input on a possible accommodation besides unpaid leave. Thus, Higa received a reasonable accommodation under the circumstances, and NACS engaged in the interactive process with Higa to find the most viable accommodation as required. *See Peterson v. Snohomish Reg'l Fire & Rescue*, No. C22-1674 TSZ, U.S. Dist. Lexis. 13749, n.15 (W.D. Wash. Jan. 25, 2024); *see also, Ansonia*, 479 U.S. at 70-71; *Nunes*, 164 F.3d at 1247.

## 2. The District Court Properly Found That Allowing Higa to Work Unvaccinated Imposed an Undue Burden

Finally, the District Court's finding that Legacy, and by extension NACS, properly showed it was an undue hardship to grant Higa's requested accommodation should be affirmed as allowing Higa to work with patients at a hospital while unvaccinated would impose an undue burden on Legacy, and by extension NACS.

---

ER 408 to suggest that the employer accepted liability. Second, the facts of that case are wholly different because the employer in that case allegedly told the employees to pay for the cost of their own COVID-19 testing as an accommodation for their religious exception which did not happen here.

Legacy's business as a hospital required that it protect the health of its patients and staff.

In the Appeal Brief, Higa argues that "Legacy Health's evidence did not show definitively that the practices and procedures sought by the plaintiffs as religious accommodations – masks and other PPE, testing, etc. – would result in substantially increased costs, or impose a substantial burden on, the operation of its health care facilities" because these practices had been used by Legacy and other organizations before the vaccine was available. Appeal Brief at 22-23. This is wrong – at summary judgment, Legacy cited multiple factual declarations with exhibits (3 ER 416-470), as well as the unrebutted report of an expert witness (4 ER 594-605) averring facts that demonstrate Legacy would have incurred substantial monetary and non-monetary costs to accommodate Higa's desire to keep working in a patient facing job while unvaccinated. Furthermore, Higa cites to Dr. Cohen's expert report to allege that these measures such as masks and the use of PPE would be sufficient – but in doing so, takes a quote entirely out of context and wholly ignores the rest of Dr. Cohen's report. Dr. Cohen's report clearly states that there was "no effective alternative to vaccination in a healthcare setting" which was "the single most effective tool available for mitigating the spread of" COVID-19 "among healthcare personnel and their patients." 4 ER 604. And the other measures noted by the Appeal Brief were only "complimentary measures to vaccination . . . and were not a

34

substitute for vaccination." 4 ER 605. As detailed extensively by both Dr. Cohen and Dr. Muller, the risk of allowing even one unvaccinated worker in a patient facing position during this time when the Delta variant was causing skyrocketing COVID-19 cases was extreme. 3 ER 416-470; 4 ER 594-605. Further, Courts have found that the risk of COVID-19 is well established and unvaccinated providers in emergency hospital care would cause safety and health concerns for patients and staff. *E.g., Beuca v. Wash. State Univ.,* No. 2:23-cv-0069-tor, 2023 U.S. Dist. LEXIS 88221, *7-8 (E.D. Wash. May 19, 2023) ("Defendant asserts that having unvaccinated internal medicine physicians would have imposed an undue hardship because it would have increased risk of exposure to COVID-19 to patients and other health care workers . . . . Defendant's proffered reason for not accommodating Plaintiff's request is sufficient to establish an undue hardship"); *George v. Grossmont Cuyamaca Cmty. Dist. Bd. of Gov.*, No. 22-cv-0424-bas-ddl, 2022 U.S. Dist. Lexis 201835, *10 (S.D. Cal. Nov. 4, 2022).

To rebut this, Higa, in the Appeal Brief at page 21, cites to *Zimmerman v. PeaceHealth*, 701 F. Supp. 3d 1099 (W.D. Wash. Nov. 9, 2023) for the alleged proposition that Legacy should have granted some accommodation to allow workers to continue working unvaccinated such as transferring them to another position or allowing them to work using PPE. However, the *Zimmerman* case is not instructive because it dealt with a motion to dismiss under 12(b)(6), meaning that the employer

35

in that case was required to rest on the facts alleged solely in Plaintiffs' Complaint. *Id* at 1111. Because of this, the Court held that the employer "could not prove the affirmative defense of undue hardship on the face of Plaintiffs' complaint" given that a "Rule 12(b)(6) dismissal on that ground is only proper if the defendant shows some obvious bar to securing relief on the face of the complaint." *Id*. As a result, the Court noted that the employer "at this stage, with the limited record before the Court" could not show the safety risk of allowing an unvaccinated employee to continue working. *Id* at 1116. Here, however, the case is on summary judgment wherein Legacy has submitted much more than limited records based on the Complaint and has instead proffered extensive evidence from two reliable medical experts showing the risks associated with allowing an unvaccinated worker to work in a patient facing role. *See* 3 ER 416-420; 4 ER 594-605. A more instructive case which relied on *Groff* is *Bushra v. Main Line Health, Inc.*, No. cv 23-1090, 2023 WL 9005584, *8 (E.D. Pa. Dec. 28, 2023). There, the Court granted a healthcare employer's motion for summary judgment against a Title VII failure to accommodate claim, stating:

> [I]t cannot be disputed that without the vaccine, [the employee] was at great risk of contracting and transmitting disease because he had frequent and direct contact with patients and staff as a doctor in the emergency room. Unvaccinated, [the employee] risked infecting and even causing the death not only of his colleagues and [the employer's] staff but also of vulnerable patients. The ability of the [the employer] to continue its mission of caring for, treating and healing the sick and injured would have been severely impaired with an unvaccinated [employee] in its midst. In sum, there can be no doubt that the [employer] would have incurred undue hardship in the form of

36

substantial, if not economic, costs if it had been required to accommodate [the employee's] religious beliefs.

Thus, allowing unvaccinated workers, including Higa, to continue close interaction with patients (including the elderly and/or particularly vulnerable patients) would have substantial ramifications, both financial and otherwise, on the company's business of providing health care. 3 ER 416-470; 4 ER 594-605; *see also*, *George v. Grossmont Cuyamaca Cmty. Coll. Dist. Bd. of Gov*., No. 22-cv-0424-bas-ddl, 2022 U.S. Dist. LEXIS, *10 (S.D. Cal. Nov. 4, 2022) ("In concluding vaccine mandates are a rational method to reduce COVID-19 infection and the risk of serious illness, hospitalization, and death related thereto, the Court rests on all fours with its sister courts in the Ninth Circuit and other circuit courts"). The information that Legacy had at the time was that COVID-19 vaccines were safe and highly effective at preventing infection, reducing transmission, and reducing the odds of severe illness and death, and that the new COVID-19 Delta variant would result in a new surge of patients. 3 ER 416-420; 4 ER 594-605. Thus, allowing unvaccinated workers to continue contact with patients would have posed heightened risks of those workers getting infected and spreading COVID-19 further during a period where COVID-19 hospitalizations and deaths were at an all-time high. 3 ER 416-470; 4 ER 594-605. These impacts on Legacy's business included not only financial costs, but also non-monetary costs to human life such as an increased risk of debilitating health outcomes and death; Legacy's particular business was the provision of health care

37

and emergency health care, and failing to take measures against preventable health

risk to protect patients and others was unacceptable. 3 ER 416-470; 4 ER 594-605.

Numerous other courts have reached similar opinions regarding the impact of

a vaccination policy on health care businesses and potential exceptions thereto. For

example, United States District Court for the Western District of Washington Judge

Thomas Zilly ruled:

> In sum, the uncontroverted evidence in this case demonstrates that
> unvaccinated firefighters were at a higher risk of contracting and
> transmitting COVID-19 even with the use of masks, PPE, testing, and
> social distancing. . . Snohomish Fire informed Plaintiffs it could not
> accommodate their vaccination exemption requests because of the
> increased health risks of working as unvaccinated firefighters. Other
> courts have found undue hardship on employers because of an
> increased risk of contracting and spreading COVID-19

*Petersen v. Snohomish Reg'l Fire & Rescue*, No. C22-1674 TSZ, 2024 U.S. Dist.

LEXIS 13749 (W.D. Wash. Jan. 25, 2024). In another case in this Circuit, a District

Court rejected a religious discrimination claim by a health care worker for a COVID-

19 vaccine exemption, reasoning:

> Based on the information and evidence available to it at this time,
> Defendant concluded that allowing an unvaccinated nurse to continue
> serving patients at the MBU posed a substantial increased cost.
> Guidelines from the CDC, FDA, and WHO, which Defendant
> reasonably concluded bore indicia of validity and reliability, combined
> with its own internal data analysis, led Defendant to conclude that an
> unvaccinated nurse in the MBU would put other staff members and its
> vulnerable patient population at risk. And allowing staff and patients to
> be put at risk compromised Defendant's mission to serve the
> community and keep it safe. Thus, allowing Plaintiff to continue as a
> nurse in the MBU without vaccination would unduly burden

Defendant's mission and, by extension, the conduct of its particular business. . . Title VII does not require Defendant to incur this substantial cost.

*MacDonald v. Or. Health & Sci. Univ*., No. 3:22-cv-01942-IM, 2024 U.S. Dist. LEXIS 118542, at \*31-32 (D. Or. July 5, 2024).

Other courts outside the Ninth Circuit have agreed. In one case, the federal court held that allowing an unvaccinated doctor to work in an emergency room imposed an undue burden:

> It cannot be disputed that without the vaccine [for COVID-19], Dr. Bushra was at great risk of contracting and transmitting the disease because he had frequent and direct contact with patients and staff as a doctor in the emergency room. Unvaccinated, Dr. Bushra risked infecting and even causing the death of not only his colleagues and MLH staff but also of vulnerable patients. The ability of MLH to continue its mission of caring for, treating, and healing the sick and injured would have been severely impaired with an unvaccinated Dr. Bushra in its midst. In sum, there can be no doubt that MLH would have incurred undue hardship in the form of substantial social, if not economic, costs if it had been required to accommodate Dr. Bushra's religious beliefs.

*Bushra v. Main Line Health, Inc*., No. CV 23-1090, 2023 WL 9005584, at \*8 (E.D. Pa. Dec. 28, 2023). Similarly, the Second Circuit found that vaccination against COVID-19 was a proper condition of employment for health care workers, *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 294 (2d Cir.), opinion clarified, 17 F.4th 368 (2d Cir. 2021). Based thereon, a District Court in New York found that the Department of Education properly showed undue hardship with regards to an accommodation request from a special education teacher whose work needed to be

in person because "even if [teacher] took precautions such as wearing gloves, mask, and a face shield, her presence as an unvaccinated individual would have presented a risk to vulnerable and still primarily unvaccinated student population and other employees." *Beickert v. New York City Dep't of Educ.*, No. 22-CV-5265(DLI)(VMS), 2023 WL 6214236, at *5 (E.D.N.Y. Sept. 25, 2023); *see also, Robinson v. Children's Hosp. Bos.*, No. cv 14-10263-djc, 2016 WL 1337255, *10 (D. Mass. Apr. 5, 2016) (finding that allowing an employee to keep a health care patient-care position with no vaccination against the flu would have posed an undue hardship because of the increased risk of transmission of the flu to its already vulnerable patient position).

In addition to the negative consequences for Legacy's business that allowing unvaccinated workers to have contact with patients and other staff would impose, violating a state law mandate would have imposed an additional undue burden on Legacy. *Suarez v. State*, No. 101386-8, 2024 Wash. LEXIS 372, *30-31 (July 25, 2024) ("the analysis of an 'undue hardship' defense" under the WLAD and related claims "is not simply a financial or monetary loss calculation. An accommodation that required the violation of a governmental mandate would cause an employer an 'undue hardship'"); *Bolden-Hardge*, 63 F.4th at 1225 (cited in Appeal Brief at 18-19)("in cases involving private employers, we have held that "an employer is not liable under Title VII [for failure to accommodate] when accommodating an

40

employee's religious beliefs would require the employer to violate federal or state law" because "the existence of such law establishes 'undue hardship'"); *Bhatia v. Chevron USA, Inc.*, 734 F.2d 1382, 1383-84 (9th Cir. 1984) (recognizing undue hardship where an accommodation would have required the employer to risk liability for violating state law); *see also*, *Dennison v. Bon Secours Charity Health Sys. Med. Grp., P.C.*, No. 22-CV-2929 (CS), 2023 WL 3467143, at *2 (S.D.N.Y. May 15, 2023) ("Title VII cannot require employers to break the law . . . When Defendants denied Plaintiffs' religious exemptions [to a COVID-19 vaccine mandate], the State Mandate required all 'covered entities', like Defendants, to 'continuously require personnel to be fully vaccinated against COVID-19," . . . Thus Defendants would have violated the State Mandate had they granted the requested exemptions. . . Plaintiffs' Title VII claim is therefore dismissed"); *Robinson v. Children's Hosp. Bos.*, No. cv 14-10263-djc, 2016 WL 1337255, *10 (D. Mass. Apr. 5, 2016) (finding it would be an undue hardship on a hospital to allow plaintiff, who worked in the emergency department, to work without a flu vaccine in light of state requirement that all licensed state hospitals vaccinate their employees). Thus, it would have been an undue hardship for Legacy to accommodate Higa in this case by allowing him to work unvaccinated as such would have violated Washington's mandate.

Furthermore, Legacy had no other possible options to accommodate Higa, whose job required him to be physically present in the hospital to treat emergency

41

patients and could not be performed remotely, because (1) the Governor's Proclamation required vaccination, not some other option; (2) the COVID-19 vaccine provided the best possible protection, known to science at the time, against serious disease caused by COVID-19 and transmission of the virus; and (3) the vaccine was different from other measures (such as masking and testing) as it came with critical benefits in preventing infection that PPE did not. Particularly on-point with regards to this is a case from the District Court of Massachusetts wherein the plaintiff argued that she should have been given some other accommodation rather than being required to be vaccinated. *Isaac v. Exec. Off. of Health & Hum. Servs.*, No. CV 22-11745-RGS 2023 WL 8544987, at *2 (D. Mass. Dec. 11, 2023), *appeal dismissed*, No. 23-2065, 2024 WL 3159284 (1st Cir. Feb. 22, 2024). In the *Issaac* case, the District of Massachusetts ruled that it was an undue hardship to grant such a request as the employer submitted evidence that the vaccine protected against infection from COVID-19 to such a degree that allowing any unvaccinated workers to be present created a greater risk of the disease being transmitted, and the Plaintiff failed to provide any evidence which a reasonable juror could find refuted the employer's evidence. *Isaac v. Exec. Off. of Health & Hum. Servs.*, No. CV 22-11745-RGS 2023 WL 8544987, at *2 (D. Mass. Dec. 11, 2023), *appeal dismissed*, No. 23-2065, 2024 WL 3159284 (1st Cir. Feb. 22, 2024); *see also, Aukamp-Corcoran v. Lancaster Gen. Hosp.*, No. cv 19-5734, 2022 WL 507479, *8 (E.D. Pa.

42

Feb. 18, 2022) (finding in favor of hospital on grounds of undue hardship where employee sought religious exemption for flu vaccine mandate where hospital presented opinion of an expert on vaccine effectiveness that opined that providing non-medical exemptions to mandatory vaccination programs for health care workers increases the risk of vaccine-preventable disease spreading)

Here, Legacy's substantial, unrefuted evidence submitted to the District Court in this case shows that, as noted above in detail, beyond being effective at preventing infection, the vaccine was shown to reduce the viral load of COVID-19 in individuals infected compared to those who were not. The vaccine also reduced severe disease and symptoms in those who did become infected (something masking cannot do). Additionally, health care providers are at a higher risk, by virtue of their profession, of being exposed to and infected by COVID-19 and it is nearly impossible to wear PPE constantly without interruption (such as in break rooms during meal periods). And additional testing posed limitations in that it took time, sometimes several days, for a result to be obtained (and no COVID-19 test is perfectly accurate). Thus, vaccination was a critical complement, not a replacement, for the other precautionary measures already in effect at Legacy's hospitals before this requirement was put into place; allowing workers to continue to utilize only the prior precautionary measures, and not also the vaccine, would endanger others. Thus, there was no alternative measure that Legacy could offer these workers if they

43

were going to continue to work in a patient-facing in-person role. Thus, because Higa was required to perform his work in-person and have direct contact with patients and their families, visitors and staff as an emergency room physician assistant, there was simply no other possible option to reduce the risk of severe disease and death caused by COVID-19 other than requiring him to be vaccinated.

## CONCLUSION

Accordingly, NACS respectfully requests that this Court affirm the District Court's decision dismissing this case because accommodating Higa by allowing him to work unvaccinated would have imposed an undue hardship for both Legacy, and by extension, NACS.

44

Dated: March 14, 2025.

*s/Benjamin J. Stone*
Benjamin J. Stone, WSBA #33436
Kylene Slocum, WSBA #58600
Kimberly A. Holdiman, WSBA #57044
Lewis Brisbois Bisgaard & Smith, LLP
1111 Third Avenue, Suite 2700
Seattle, Washington 98101
(206) 436-2020
Benjamin.Stone@lewisbrisbois.com
Kylene.Slocum@lewisbrisbois.com
Kimberly.Holidman@lewisbrisbois.com
Attorneys for Defendant-Appellee Nor
Northwest Acute Care Specialists

45

# CERTIFICATE OF COMPLIANCE FOR BRIEFS
## 9TH CIRCUIT CASE NUMBER 24-5977

I am the attorney for Northwest Acute Care Specialists.

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Fed. R. App. P. 32(a)(5) and (6), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 10,862 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Times New Roman 14-point font.

Dated: March 14, 2025.

*s/Benjamin J. Stone*
Benjamin J. Stone, WSBA #33436
Kylene Slocum, WSBA #58600
Kimberly A. Holdiman, WSBA #57044
Lewis Brisbois Bisgaard & Smith, LLP
1111 Third Avenue, Suite 2700
Seattle, Washington 98101
(206) 436-2020
Benjamin.Stone@lewisbrisbois.com
Kylene.Slocum@lewisbrisbois.com
Kimberly.Holidman@lewisbrisbois.com
Attorneys for Defendant-Appellee Northwest Acute Care Specialists

46

## CERTIFICATE OF SERVICE FOR ELECTRONIC FILING

## 9TH CIRCUIT CASE NUMBER 24-5977

I hereby certify that on March 14, 2025, I electronically filed the foregoing with the Clerk of the U.S. Court of Appeals for the Ninth Circuit using the Appellate Electronic CM/ECF Filing System, which will send notification of such filing to all attorneys of record listed below:

*Counsel for Appellants:*
Corey Evan Parker, WSBA #40006
The Appellate Law Firm
300 Lenora St., Ste. 900
Seattle, WA 98121
(855) 941-5796
corey@mltalaw.com
dave@mltalaw.com

*Counsel for Plaintiff Harold C. Williams, Jr.*
Tracy Tribbett
PACIFIC JUSTICE INSTITUTE
6404 Three Rivers Drive
Pasco, WA 99301
ttribbett@pji.org

*Counsel for Defendant Legacy Health*
Adam S. Belzberg, WSBA #41022
Aaron R. Doyer, WSBA #60095
Whitney A. Brown
Stoel Rives LLP
600 University Street, Suite 3600
Seattle, WA 98101
206.624.0900
adam.belzberg@stoel.com
Aaron.doyer@stoel.com
whitney.brown@stoel.com
sandra.watanabe@stoel.com

leslie.boston@stoel.com
brie.carranza@stoel.com
perette.smith@stoel.com
karen.warne@stoel.com
4273170420@filings.docketbird.com
babette.brewer@stoel.com
docketclerk@stoel.com

Dated March 14, 2025, at Seattle, Washington.

*s/Tami L. Foster*
Tami L. Foster
Tami.Foster@lewisbrisbois.com

48