*No. 24-5977*

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

HAROLD C. WILLIAMS, JR., et al.,

*Plaintiffs-Appellants*,

v.

LEGACY HEALTH, A Public Benefit Corporation, NORTHWEST ACUTE CARE SPECIALISTS, an Oregon Professional Corporation, and DOES 1 THROUGH 10, Inclusive,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Washington
Hon. Tiffany M. Cartwright
Case No. 3:22-cv-06004 TMC

## RESPONSE BRIEF OF APPELLEE LEGACY HEALTH

WHITNEY A. BROWN
whitney.brown@stoel.com
STOEL RIVES LLP
510 L Street, Suite 500
Anchorage, AK 99501
Telephone: 907.277.1900

ADAM S. BELZBERG
adam.belzberg@stoel.com
AARON R. DOYER
aaron.doyer@stoel.com
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: 206.624.0900
Facsimile: 206.386.7500

*Attorneys for Appellee Legacy Health*

127225039.4 0015023-00428

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

I.     INTRODUCTION .................................................................................... 1

II.    ISSUES PRESENTED .............................................................................. 2

III.   JURISDICTIONAL STATEMENT ........................................................ 3

IV.   STATEMENT OF THE CASE ................................................................ 3

     A.    Legacy ............................................................................................ 3

     B.    COVID-19 ...................................................................................... 4

     C.    Legacy's Response to the Pandemic ............................................. 5

     D.    COVID-19 Vaccines ..................................................................... 8

     E.    Legacy's Vaccination Efforts ...................................................... 10

     F.    The Delta Variant ........................................................................ 12

     G.    Legacy's COVID-19 Vaccination Policy .................................... 14

     H.    Governor Inslee's Proclamation 21-14 and Legacy's Covid-19 Vaccination Policy ..................................................................... 19

     I.    Appellants' Employment with Legacy ....................................... 20

          1.    Appellant Toby Higa—Physician Assistant ..................... 20

          2.    Appellant Aimee Sweet—Respiratory Therapist .............. 22

          3.    Appellant Risa Brody—Registered Nurse ....................... 22

          4.    Appellant Damaris Brici—Registered Nurse .................. 23

          5.    Appellant Brianna Hall—Registered Nurse ..................... 23

          6.    Appellant Ivan Atanassov—Respiratory Therapist .......... 24

          7.    Appellant Daniela Marianu—Registered Nurse .............. 24

          8.    Appellant Angela Loghry—Registered Nurse .................. 25

          9.    Appellant Harold Williams—Distribution Technician ...... 25

     J.    Appellants' Religious Exception Requests ................................. 27

- i -

K. Procedural History.................................................................27

V. SUMMARY OF ARGUMENT.................................................28

VI. STANDARD OF REVIEW....................................................29

VII. ARGUMENT........................................................................30

    A. Legacy Was Not Required to Accommodate Appellants' Alleged Religious Beliefs Because Doing So Would Have Imposed an Undue Hardship.................................................................31

        1. Existing Authority Supports Legacy's Position that an Accommodation that Poses Health and Safety Risks to Others Results in "Substantial Increased Costs" Under *Groff*................................................................31

        2. The Undisputed Evidence in this Case Reveals that Accommodating Employees Whose Jobs Require In-Person Contact Would Pose an Undue Hardship to Legacy ................36

        3. Appellants' Cases Do Not Change the Result ..........................45

    B. Appellants' New Failure-to-Interact Argument Was Not Raised Below and Is Meritless in Any Event .................................................48

        1. Appellants Waived Their Failure-to-Interact Argument ..........48

        2. Appellants' Argument Is Meritless Because Legacy Interacted in Good Faith with Appellants.................................49

        3. Appellants' New Arguments Are Immaterial..........................52

VIII. CONCLUSION...................................................................53

- ii -

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Allen v. Ornoski*,
435 F.3d 946 (9th Cir. 2006) ................................................................48

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..............................................................................29

*Beck v. Univ. of Wisconsin Bd. of Regents*,
75 F.3d 1130 (7th Cir. 1996) ................................................................50

*Bhatia v. Chevron U.S.A., Inc.*,
734 F.2d 1382 (9th Cir. 1984) ..............................................................32

*Bingham v. City of San Jose*,
No. H051386, 2024 WL 4615360 (Cal. Ct. App. Oct. 30, 2024) .....................47

*Black v. Grant Cnty. Pub. Util. Dist.*,
No. 2:17-CV-365-RMP, 2019 WL 2617236 (E.D. Wash. June 26,
2019), *aff'd in part and rev'd in part on other grounds*, 820 F.
App'x 547 (9th Cir. 2020) ................................................................30

*Brit. Airways Bd. v. Boeing Co.*,
585 F.2d 946 (9th Cir. 1978) ................................................................38, 41

*Brody v. Legacy Health*,
No. 23-cv-5595, ECF 14 (W.D. Wash. July 26, 2023) ...................................27

*Citicorp Real Est., Inc. v. Smith*,
155 F.3d 1097 (9th Cir. 1998) ..............................................................29

*Dollar v. Goleta Water District*,
No. 2:22-cv-03723, ECF 54 (C.D. Cal. Dec. 29, 2022) ...................................47

*Efimoff v. Port of Seattle*,
No. 2:23-cv-01307-BAT, 2024 WL 4765161 (W.D. Wash. Nov.
13, 2024) ................................................................38

127225039.4 0015023-00428

*Groff v. DeJoy*,
  600 U.S. 447 (2023) ................................................................................passim

*Hailey v. Legacy Health*,
  No. 3:23-CV-00149-IM, 2024 WL 4253238 (D. Or. Sept. 20,
  2024) .........................................................................................................36, 43

*Higa v. Legacy Health*,
  No. 23-cv-5205, ECF 29 (W.D. Wash. July 26, 2023) ....................................27

*Humphrey v. Mem'l Hosps. Ass'n*,
  239 F.3d 1128 (9th Cir. 2001) ........................................................................52

*Kizer v. St. Jude Children's Rsch. Hosp.*,
  No. 24-5207, 2024 WL 4816856 (6th Cir. Nov. 18, 2024) ..............................49

*Kumar v. Gate Gourmet Inc.*,
  180 Wn.2d 481, 325 P.3d 193 (2014)..............................................................30

*Lavelle-Hayden v. Legacy Health*,
  No. 3:22-CV-01752-IM, 2024 WL 3822712 (D. Or. Aug. 14,
  2024) .................................................................................................................36

*Lowe v. Mills*,
  68 F.4th 706 (1st Cir. 2023), *cert. denied*, 144 S. Ct. 345 (2023).....................47

*MacDonald v. Oregon Health & Sci. Univ.*,
  No. 3:22-CV-01942-IM, 2024 WL 3316199 (D. Or. July 5, 2024)..................33

*Marianu v. Legacy Health*,
  No. 23-cv-5586, ECF 12 (W.D. Wash. July 26, 2023) ....................................27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986).................................................................................37, 46

*Melino v. Boston Medical Center*,
  127 F.4th 391 (1st Cir. 2025)..............................................................33, 34, 49

*Momox-Caselis v. Donohue*,
  987 F.3d 835 (9th Cir. 2021) ...............................................................48, 49

- iv -

*Nelson v. Pima Cmty. Coll.*,
    83 F.3d 1075 (9th Cir. 1996) ...................................................................38

*Nilsen v. Univ. of Wash. Med. Ctr.*,
    No. C23-1498 MJP, 2024 WL 4723233 (W.D. Wash. Nov. 8,
    2024) ........................................................................................................35

*Okonowsky v. Garland*,
    109 F.4th 1166 (9th Cir. 2024) ................................................................29

*One Indust., LLC v. Jim O'Neal Distributing, Inc.*,
    578 F.3d 1154 (9th Cir. 2009) ...........................................................44, 48

*Opuku-Boateng v. California*,
    95 F.3d 1461 (9th Cir. 1996) ...................................................................32

*Osborne v. Recreational Equip. Inc.*,
    196 Wash. App. 1048 (2016).....................................................................52

*Richards v. Neilsen Freight Lines*,
    810 F.2d 898 (9th Cir. 1987) ...................................................................38

*Rodrique v. Hearst Commc'ns, Inc.*,
    126 F.4th 85 (1st Cir. 2025)......................................................................34

*Russo v. Patchogue-Medford Sch. Dist.*,
    No. 24-378-cv, 2025 WL 610302 (2d Cir. Feb. 26, 2025).......................34

*Slater v. Behavioral. Health Res.*,
    No. 23-5270 RJB, 2024 WL 4290289 (W.D. Wash. Sept. 25, 2024) ..........35, 39

*Snapp v. United Transportation Union*,
    889 F.3d 1088 (9th Cir. 2018) ...........................................................49, 52

*Soremekun v. Thrifty Payless, Inc.*,
    509 F.3d 978 (9th Cir. 2007) ...................................................................30

*Stephens v. D.B. Roberts, Inc.*,
    No. 21-35726, 2022 WL 16849063, at *1 (9th Cir. Nov. 10, 2022)..................52

127225039.4 0015023-00428

*Strandquist v. Wash. State Dep't of Soc. & Health Servs.*,
No. 3:23-CV-05071-TMC, 2024 WL 4645146 (W.D. Wash. Oct.
31, 2024), *reconsideration denied*, 2024 WL 4979859 (W.D.
Wash. Dec. 4, 2024)................................................................................35

*Suarez v. State*,
23 Wn. App. 2d 609, 517 P.3d 474 (2022), *review granted in part,
denied in part*, 200 Wn.2d 1026, 523 P.3d 1186 (2023) ....................30

*Suarez v. State*,
3 Wash.3d 404, 552 P.3d 786 (2024) ..................................................32

*Zimmerman v. PeaceHealth*,
701 F. Supp. 3d 1099 (W.D. Wash. 2023) ...............................45, 46, 47

**Statutes**

28 U.S.C. § 1291 .....................................................................................3

28 U.S.C. § 1331 .....................................................................................3

28 U.S.C. § 1367(a) .................................................................................3

**Rules**

Fed. R. Civ. P. 56(c)..............................................................................46

Fed. R. Civ. P. 56(c)(1)....................................................................37, 39

**Other Authorities**

EEOC, *What You Should Know About COVID-19 and the ADA, the
Rehabilitation Act, and Other EEO Laws*, (updated July 12, 2022),
https://www.eeoc.gov/wysk/what-you-should-know-about-covid-
19-and-ada-rehabilitation-act-and-other-eeo-laws ............................33

127225039.4 0015023-00428

**FRAP 26.1 DISCLOSURE STATEMENT**

In accordance with Federal Rule of Appellate Procedure 26.1, Appellee Legacy Health, formerly known as Legacy Health System ("Legacy"), discloses that it is an Oregon nonprofit corporation. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

127225039.4 0015023-00428

## I.    INTRODUCTION

Appellants are former healthcare workers at Appellee Legacy Health's ("Legacy") Salmon Creek Medical Center ("Salmon Creek").[1]  Each Appellant provided hands-on, direct care to patients, or were required to work on site and interact with other healthcare workers, patients, and patient families.  At the height of the Delta wave of COVID-19 cases, hospitalizations, and deaths in Washington, Appellants refused to receive the COVID-19 vaccine as mandated by Legacy's COVID-19 Vaccination Policy ("Vaccine Policy"), and Washington's Governor, for all healthcare workers.

It is undisputed that none of the Appellants requested to work remotely, nor could they have worked remotely given the requirements of their positions.  It is also undisputed that Legacy considered whether the accommodations that Appellants requested—masking, increased testing, and staying home when sick— could reasonably be granted.  But the evidence demonstrated that Appellants' proposed accommodations were not reasonable alternatives to vaccination.

The evidence further showed that allowing the Appellants to provide direct patient care, or to work in areas requiring contact with coworkers, patients, and

---

[1] Appellant Toby Higa is still employed with Appellee Northwest Acute Care Specialists ("NACS") and resumed his contract services for Legacy at the Salmon Creek facility after becoming fully vaccinated.

- 1 -

families, while unvaccinated would have imposed an undue hardship on Legacy. In its Motion for Summary Judgment, Legacy submitted the testimony of its Chief Medical Officer, Dr. Melinda Muller, and the expert testimony of Dr. Seth Cohen, describing the accommodation request process and the detailed considerations that led to Legacy's conclusion that Appellants' requests presented an undue hardship. Appellants did not dispute (or even reference) this evidence on summary judgment. They offered no facts in the record to challenge Legacy's undue hardship defense.

The district court correctly concluded that no genuine dispute of fact existed and granted Legacy's motion for summary judgment. This Court should affirm.

## II.  ISSUES PRESENTED

1.  Whether the District Court correctly held that Legacy did not fail to reasonably accommodate Appellants because allowing Appellants to work while unvaccinated posed an undue hardship and because Appellants failed to provide contradictory evidence.

2.  Whether Appellants' claim for failure to interact, which Appellants did not raise in the district court, should fail because (1) it was waived; and (2) Legacy carefully considered each of Appellants' accommodation requests and determined that Appellants could not be accommodated without imposing undue hardship on Legacy.

- 2 -

## III.   JURISDICTIONAL STATEMENT

Legacy agrees with Appellants that the District Court had jurisdiction over this case under 28 U.S.C. §§ 1331 and 1367(a); that the District Court's August 29, 2024 Order Granting Defendants' Motions for Summary Judgment, *see* 2-ER-6, and Judgment entered on the same date, *see* 1-ER-3, was an appealable final decision; and that Appellants' notice of appeal to this Court was timely, *see* 4-ER-758.  This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## IV.   STATEMENT OF THE CASE

The following facts, presented to the trial court by Legacy, are undisputed in the record.

### A.   Legacy

Legacy is a regional, non-profit healthcare system that operates eight hospitals in the Portland, Oregon and Vancouver, Washington metropolitan areas and the mid-Willamette Valley.  3-ER-416 ¶ 4.  Legacy's hospitals include a full-service children's hospital, a 24-hour mental and behavioral health hospital, and more than 70 primary care, specialty, and urgent care clinics.  *Id*.  Legacy has approximately 14,000 employees and nearly 3,000 allied healthcare providers who collectively provide safe, quality medical care.  *Id*.

- 3 -

**B. COVID-19**

COVID-19 is a disease caused by the coronavirus SARS-CoV-2, which was first reported in Wuhan, China in late 2019. 4-ER-596, ¶ 15. By March 2020, the virus had reached Legacy's facilities in Washington, and the World Health Organization declared the COVID-19 outbreak a pandemic. *Id.*; 3-ER-416, ¶ 5.

COVID-19 presented numerous challenges to healthcare systems like Legacy. First, the virus is easily transmitted. The primary way COVID-19 spreads is via infected respiratory droplets and aerosols. 4-ER-598, ¶ 20. An individual infected with COVID-19 emits respiratory secretions containing viral particles, some of which evaporate in the form of aerosols and remain in the air, which may contribute to longer-range transmission. *Id.* Moreover, some infected individuals may remain asymptomatic. 4-ER-599, ¶ 21.

Second, COVID-19 is associated with several severe clinical outcomes, even among healthy individuals. 4-ER-603–04, ¶ 32. By December 15, 2021, one out of every 100 persons in the United States above the age of 65 had died from COVID-19 and the U.S. death toll exceeded 800,000. 4-ER-603, ¶ 29. COVID-19 is especially dangerous for individuals over 65 or those with medical comorbidities—two populations that Legacy frequently serves at its facilities. 4-ER-597–98, ¶ 19; 4-ER-423–24, ¶ 28. When these vulnerable individuals become

- 4 -

infected, they are more likely to require hospitalization, intensive care monitoring, and mechanical ventilation.  4-ER-597–98, ¶ 19.

Third, healthcare providers are at especially high risk of being infected with COVID-19 because (1) they are frequently unable to socially distance at work, (2) they often work in facilities where there are outbreaks, and (3) they continued to report for duty after the pandemic hit while employees in many other fields were able to work remotely.  4-ER-604–05, ¶ 34.  Additionally, many healthcare providers work with vulnerable populations, raising the risk and consequences of transmitting the virus to others.  4-ER-603–04, ¶¶ 32-33.

### C. Legacy's Response to the Pandemic

From the beginning of the pandemic, Legacy's Senior Leadership Team ("SLT"), which included its Chief Executive Officer and Senior Vice Presidents, relied on scientific consensus, agency guidance (including from the Centers for Disease Control and Prevention ("CDC") and the Washington State Health Care Authority), and the expertise of its own clinical leaders when implementing COVID-19-related policies and procedures.  3-ER-416, ¶ 5.  The SLT's overarching goals were to ensure that Legacy remained able to provide the safest

possible environment for patients and providers,[2] while preserving its ability to continue serving its communities during a global public health crisis.  *Id*.  But the obstacles to doing so were significant.  3-ER-416–17, ¶ 6.  Some patients delayed or declined to seek care, making their health conditions more dire when they finally sought treatment at Legacy's facilities.  *Id*.; 4-ER-604, ¶ 33.  Even as some avoided the hospital, Legacy's facilities were continuously at capacity.  3-ER-416–17, ¶ 6.  At times, elective surgeries and non-emergent and urgent care were suspended so that staff could be redeployed to address an influx of COVID-19 patients.  *Id*.  Unsurprisingly, the pandemic hit Legacy's providers, too.  Staff use of sick time was significantly higher than normal, with hundreds of employees out sick or on work restrictions at any given time.  3-ER-417, ¶ 7.  These staffing fluctuations exacerbated the strain on Legacy's ability to provide patient care.  *Id*.

To ensure that it could continue providing medical care during this critical time, Legacy sought to limit the spread of COVID-19 within its facilities.  3-ER-417, ¶ 8.  Its Infection Prevention and Control team led the efforts to reduce risk on Legacy's premises through the implementation of an Infection Control Plan that was shared with all providers, under which patient and staff infections were

---

[2] Legacy uses the term "providers" throughout this briefing to mean employees, contractors, and other health care workers providing services in Legacy's facilities.

127225039.4 0015023-00428

carefully tracked and monitored.  *Id*.  Safety measures were adjusted as the pandemic progressed and more information became available about what measures most effectively prevented transmission.  These safety measures included requiring the use of Personal Protective Equipment ("PPE"), testing, temperature checks, self-reporting illness or symptoms, social distancing when possible, and various hygiene protocols including hand hygiene, environmental disinfection, and room air changes.  *Id*.

Legacy also kept an open line of communication with its employees and contractors as the COVID-19 crisis evolved.  3-ER-417–18, ¶ 9.  All Legacy providers met daily in huddles to discuss safety and other current issues.  *Id*. Legacy also sent frequent written updates about current events, upcoming changes, and other related information to its workforce, including a weekly update to all providers focusing specifically on the latest COVID-19-related developments.  *Id*.

Notwithstanding transmission-mitigation efforts, including masking, testing, and social distancing whenever possible, COVID-19-related hospitalizations and deaths continued to grow.  3-ER-418, ¶ 10.  By December 1, 2020, Legacy was treating over 126 COVID-19-positive patients—a statewide high—at its facilities on an inpatient basis.  3-ER-44, 441.  The caseload required Legacy's use of

- 7 -

refrigerated semi-truck trailers as temporary, overflow morgues for deceased patients. 3-ER-441.

Finally, in early December 2020, the first COVID-19 vaccine shipments arrived at Legacy, "bringing with them hope and optimism for a return to normalcy" in Legacy facilities. 3-ER-442, Ex. 4.

### D. COVID-19 Vaccines

The Food and Drug Administration ("FDA") issued an initial Emergency Use Authorization ("EUA") for the Pfizer BioNTech COVID-19 vaccine on December 11, 2020, followed by an EUA for the Moderna and Johnson & Johnson vaccines on December 18, 2020, and February 2021, respectively. 4-ER-599, ¶ 22. The Pfizer vaccine received full FDA approval in August 2021, and the Moderna vaccine received full FDA approval in January 2022. *Id*.

The vaccines were safe and effective at both preventing infection and reducing severe illness and death, and their arrival was an important step in reducing the impact of COVID-19 at healthcare facilities. 4-ER-599–600, 603, ¶¶ 23, 25, 30–31. High vaccination rates reduce overall transmission risk, in part because people who are vaccinated are less likely to become infected, which in turn reduces the likelihood that they will infect others. 4-ER-600, ¶ 24. For example, one study found that two vaccine doses were significantly associated

127225039.4 0015023-00428

with a 50% decrease in cases. *Id*. Through the end of June 2021, COVID-19 vaccines had averted an estimated 279,000 deaths and 1.25 million hospitalizations in the United States. 4-ER-603, ¶ 30. The COVID-19 vaccines were also unparalleled in their ability to protect both healthcare workers and their patients. 4-ER-604–05, ¶ 34. One CDC study involving healthcare personnel showed a vaccine effectiveness of 80% in preventing infection. 4-ER-601, ¶ 26.

Although the safety measures that Legacy took before vaccines arrived (including requiring employees to use PPE, stay home while sick, test, and social distance when possible) were effective to a certain extent, all are subject to practical limitations in a work environment. *Id*. For example, testing alone is not effective at reducing infection because unvaccinated individuals may not test positive until several days into their infection and may, in the interim, inadvertently contribute to significant outbreaks among patients, colleagues, and families. 4-ER-605, ¶ 35. Masks help prevent acquisition of infection but do not help diminish the severity of symptoms once someone is infected, nor can they realistically be worn without interruption. 4-ER-605–06, ¶ 37. For this reason, it is unsurprising that many cases of COVID-19 acquired in healthcare settings occurred in breakrooms as well as in the community. *Id*.; 3-ER-417, ¶ 8.

- 9 -

Finally, the benefits of COVID-19 vaccination extended to all healthcare workers, regardless of whether they had previously been infected with the virus (or had what is sometimes referred to as "natural immunity"). 4-ER-602, ¶ 28. One CDC study found that being unvaccinated was associated with 2.3 higher odds of reinfection compared to being fully vaccinated. *Id.* In patients with prior infection, vaccination still boosted antibody levels and cell mediated immunity, and increased the duration and spectrum of protection from COVID-19. *Id.* Accordingly, the CDC recommended universal vaccination regardless of prior infection. *Id.*

### E. Legacy's Vaccination Efforts

Legacy sought to ensure that information about COVID-19 vaccines was disseminated promptly and accurately. 3-ER-418, ¶ 11. It made significant efforts to educate employees about the logistics and safety of the COVID-19 vaccines once they became available. 3-ER-418, ¶ 12. Its outreach included hosting over a dozen town hall meetings for providers to ask questions, creating a comprehensive "Frequently Asked Questions" document for providers, developing a consumer-facing vaccine education website, establishing a hotline for providers to call if they had confidential questions about the vaccines, and providing updates on vaccine safety studies. *Id.*

- 10 -

Legacy's vaccination efforts were swift and expansive. By December 14, 2020, Legacy had received its first shipment of vaccines; one week later, it had administered almost the entire supply. 3-ER-419, ¶¶ 13–14; 3-ER-443–46. Priority was given to providers (like many of the Appellants) who worked in units with a high COVID-19 burden, including the emergency department, intensive care unit, and segregated COVID-19 care centers. 3-ER-419, ¶ 13; 3-ER-443. By mid-January 2021, Legacy had administered 11,000 first doses of the COVID-19 vaccines to frontline providers and announced that it would soon expand its vaccination efforts to those who worked in the system office. 3-ER-419, ¶¶ 14–15; 3-ER-447–49, Exs. 9–10.

By March 4, 2021, after all Legacy providers were eligible to receive the COVID-19 vaccine, approximately 70% of employees were vaccinated, with 17,600 providers and older residents vaccinated at Salmon Creek since December 23, 2020. 3-ER-419–20, ¶ 16; 3-ER-451. Despite widespread vaccine availability, it became apparent that a significant portion of the provider population did not intend to get vaccinated. *Id*. Legacy increased its efforts to encourage voluntary vaccination through a variety of measures, including streamlining the process of scheduling vaccination appointments, working with other healthcare institutions to secure additional space at the Oregon Convention Center to administer COVID-19

- 11 -

127225039.4 0015023-00428

vaccines, providing incentivized sick pay for employees who were fully vaccinated, working with staff leaders in units with lower vaccination rates to encourage voluntary vaccination, and offering raffles for fully vaccinated employees. 3-ER-420, ¶ 17.

Those efforts led to some success. By July 1, 2021, 84% of employees were fully vaccinated. 3-ER-454. Nevertheless, 16% of the employee population—or approximately 2,240 employees—remained unvaccinated. 3-ER-420, ¶ 19. The number had remained largely static since March 2021 and was concerning to the SLT, particularly given the medical consensus that vaccination against COVID-19 was the best tool available to reduce infection and transmissibility, along with severe illness and death. *Id*.; 4-ER-599–600, 604–05, ¶¶ 23, 34.

### F.    The Delta Variant

In summer 2021, the Delta variant became the dominant COVID-19 variant in the United States. 4-ER-597, ¶ 18. Compared to prior variants, Delta was not only more transmissible but was also associated with a significantly higher risk of severe disease and hospitalization. *Id*. Although COVID-19 cases had declined in early 2021, they abruptly skyrocketed by 1,200% during the Delta surge between June and September 2021, with hospital admissions up by 600% nationwide with a death toll of up to 1,500 Americans daily. 4-ER-603, ¶ 29. Unvaccinated

- 12 -

individuals were far more likely to be impacted; for example, a CDC study showed that people who were unvaccinated were three times (300%) more likely to be infected with COVID-19 compared to those who were fully vaccinated, regardless of age, race, and ethnicity.  4-ER-601, ¶ 26.

Legacy closely monitored the Delta variant's projected impact on its system. During daily huddles, senior leaders (including the SLT) reviewed forecasts, including an Oregon statewide publicly available COVID-19 forecasting model developed by Oregon Health and Science University epidemiologist Dr. Peter Graven (the "Graven Model"), along with internal metrics on Legacy's COVID-19 case count and capacity to handle patients at various locations.  3-ER-421, ¶ 21.  In the second half of July 2021, the number of anticipated COVID-19 cases shot dramatically upward, and both the Graven Model and Legacy's own internal forecasting began predicting a surge in COVID-19 cases far surpassing previous records.  3-ER-421, ¶¶ 22–23; 3-ER-457–459.  For example, on July 20, 2021, Legacy's models predicted an upcoming wave of COVID-19 hospitalizations roughly equivalent to the previous surge in spring 2021.  3-ER-457.  Only one week later, on July 27, 2021, the models predicted an increase of COVID-19 hospitalizations that would shatter previous records.  3-ER-458.  By August 2,

- 13 -

127225039.4 0015023-00428

2021, forecasts for COVID-19 hospitalizations dwarfed anything experienced during the pandemic up until that point. 3-ER-459.

Legacy implemented several measures in anticipation of the coming surge, including reinstituting visitor restrictions and temporarily pausing non-emergency surgical procedures to support hospital capacity. 3-ER-421–22, ¶ 24. But there was a strong consensus that those efforts, along with the safety measures that Legacy providers had taken throughout the pandemic, would not be enough given the gravity of what Legacy and other health systems were facing and the existing medical science's indications about the importance of vaccination. *Id*. The SLT was mindful that many healthcare organizations across the country had begun requiring employees to be vaccinated against COVID-19. *Id*. In the end, the SLT determined that it needed to act. *Id*.

### G. Legacy's COVID-19 Vaccination Policy

On August 5, 2021, Legacy announced to all providers that it was enacting the Vaccination Policy, which required that all Legacy "caregivers"[3] become fully

---

[3] The term "caregiver" included: "physicians (employed and independent), credentialed medical staff (as well as their employed, contracted, and/or sponsored advanced practice providers), fellows, residents, interns, advanced practices providers, nurses, clinical and non-clinical employees, students, volunteers, clergy, contracted personnel, vendors, and any others who conduct business or perform services within Legacy locations." 3-ER-422, ¶ 25; 3-ER-461.

- 14 -

vaccinated against COVID-19 or have an approved exception by September 30, 2021.[4]  3-ER-422, ¶ 25; 3-ER-460–63.  The Vaccination Policy was broadly disseminated via Legacy's internal broadcast system and emails to everyone affected.  *Id*.

The SLT's decision to enact the Vaccination Policy was not made lightly.  3-ER-422–23, ¶ 26.[5]  Multiple internal stakeholders, including experts in infectious diseases and infection control, worked with the SLT on the development and implementation of the policy, along with Legacy leaders in the Human Resources, Employee Health, Ethics, Operations, Compliance, and Legal Departments.  *Id*.  In a message to all providers, Legacy's then-Chief Human Resources Officer and former SLT member, Sonja Steves, stated:

> In my 33 years at Legacy, I can't recall a policy decision that was more complex or carried as much weight as our decision to require all employees to be vaccinated against COVID-19 . . . [o]ur goal is not to penalize employees, providers or vendors with this requirement.  It is quite simply to ensure the safety of our people, our patients and our community.  Above all else, providing a safe

---

[4] The September 30, 2021 deadline was later extended to October 18, 2021, 3-ER-422, ¶ 25, which coincided with the date of the deadline in Washington Governor Inslee's Proclamation.  Wash. Proclamation No. 21-14 (Aug. 9, 2021).

[5] While COVID-19 represented a unique challenge, vaccination policies for health and safety reasons were not new to Legacy.  3-ER-422–23, ¶ 26.  Prior to the Vaccination Policy, Legacy had already implemented policies regarding numerous vaccines, including the flu vaccine, subject to eligible declinations.  *Id*.

> environment to receive and deliver care is our most
> important act, and the science has shown that vaccines
> are safe and effective in helping us do that.

3-ER-422–23 ¶ 27; 3-ER-464.

The SLT ultimately determined that the Vaccination Policy was necessary for many reasons. First and foremost, available vaccines were safe and highly effective at preventing infection and reducing cases of severe illness and death. 3-ER-423–24, ¶ 28. Vaccinated individuals tended to carry a lower viral load and were thus less likely to spread COVID-19. *Id.* Vaccination against COVID-19 also provided all of the benefits—with none of the limitations—of other safety measures such as testing and PPE usage. *Id.*

The SLT also considered that many in Legacy's patient population were particularly susceptible to severe illness and death from COVID-19 due to their age and/or pre-existing medical conditions, and that the Delta variant was spreading quickly and would stress Legacy's already overburdened system. *Id.* Legacy also had a responsibility to protect patients and providers from unreasonable safety risks and needed to maintain adequate staffing levels to provide high-quality patient care (and would be less able to do so if employees were out ill with COVID-19). *Id.* Furthermore, Legacy was committed to ensuring that members of the public felt safe accessing medical care at its facilities

- 16 -

and believed that ensuring all employees were fully vaccinated would bolster the public's confidence. *Id.*

Legacy established and communicated with employees about a process for submitting exception requests and established a Vaccine Exception Work Group including primary care doctors, immunologists and infectious disease specialists, ethicists, and clergy members to review employee requests for medical and religious exceptions from the Vaccination Policy. 3-ER-424, ¶ 29.

The SLT continued evaluating whether employees seeking religious exceptions could be accommodated in on-site roles. 3-ER-424–25, ¶ 30. Ultimately, the SLT determined that, consistent with available science, having unvaccinated employees on-site presented an unreasonable health and safety risk, and it approved only a handful of exceptions for non-patient-facing individuals who could perform their job functions without encountering other providers or patients. *Id*. The SLT's conclusion was bolstered by its awareness of the fact that transmissions were still occurring even as Legacy took all appropriate steps to prevent them, increasing the risk of patient or provider infection, provider absences, and other undesirable consequences that hindered Legacy's ability to provide the safest possible care and work environment. 4-ER-604, ¶ 33; 3-ER-425, ¶ 31. The SLT determined that the potential harm that could result from allowing

- 17 -

even a single unvaccinated employee to come into contact with patients (some of whom were so vulnerable to infection that everyday items such as fresh fruit or flowers were not allowed into their rooms), or other providers was unacceptable. 3-ER-425, ¶ 31. The SLT was also mindful that hundreds of employees had requested exceptions, which only multiplied the risk. *Id.*

The information Legacy continued to receive in the weeks after announcing the Vaccination Policy underscored the decision that its enactment was critical to keeping its facilities safe. An August 19, 2021 employee news bulletin notified employees that:

> The highly contagious COVID-19 Delta variant continues to send people to Oregon hospitals at alarming rates in this fifth wave of the pandemic. The COVID-19 models paint a grim picture with Legacy expecting to see anywhere between 174 to 194 COVID-19 patients by next week. Those would be the highest one-day totals since the pandemic started.

3-ER-425, ¶ 32; 3-ER-465.

Additionally, the patients that arrived at Legacy were, by and large, unvaccinated. *See* 3-ER-425–26, ¶ 33 & 3-ER-468 (showing that as of late August 2021 over 85% of COVID-19 patients hospitalized at Legacy were unvaccinated, 90% of COVID-19 patients were on a ventilator, and 91% of COVID-19 patients in the intensive care unit ("ICU") were unvaccinated).

- 18 -

All told, the Vaccination Policy was a success for employee and patient safety. 3-ER-426, ¶ 34. By October 2021, 96% of Legacy employees were fully vaccinated. 3-ER-469. And although Legacy lost many dedicated employees who elected not to comply with the Vaccination Policy, its decision to act quickly proved to be both prudent and prescient. *Id*. ICU admissions at Legacy facilities peaked in September 2021 and nearly 200 COVID-19-positive patients were receiving care within the system at various points that month, a dramatic increase from previous highs in December 2020. 3-ER-470.

**H.    Governor Inslee's Proclamation 21-14 and Legacy's Covid-19 Vaccination Policy**

At the same time Legacy was implementing its Vaccination Policy, on August 9, 2021, Washington Governor Jay Inslee issued Proclamation 21-14 which, among other things, prohibited:

> Any Health Care provider from failing to be fully
> vaccinated against COVID-19 after October 18, 2021;
> and Any individual or entity that operates a Health Care
> Setting from permitting a Health Care Provider to engage
> in work for the individual or entity as an employee,
> contractor, or volunteer after October 18, 2021 if the
> Health Care Provider has not been fully vaccinated
> against COVID-19 and provided proof thereof to the
> individual or entity.

Wash. Proclamation No. 21-14 (Aug. 9, 2021). With respect to being "fully vaccinated," the Proclamation provided that:

- 19 -

127225039.4 0015023-00428

> A person is fully vaccinated against COVID19 two weeks after they have received the second dose in a two-dose series of a COVID-19 vaccine authorized for emergency use, licensed, or otherwise approved by the FDA (e.g., Pfizer-BioNTech or Moderna) or two weeks after they have received a single-dose COVID-19 vaccine authorized for emergency use, licensed, or otherwise approved by the FDA (e.g., Johnson & Johnson (J&J)).

*Id*.

Accordingly, to be fully vaccinated by October 18, 2021, Legacy's health care providers had to receive two doses of the Pfizer-BioNTech or Moderna, or one dose of the J&J vaccine by October 6, 2021.

## I. Appellants' Employment with Legacy

### 1. Appellant Toby Higa—Physician Assistant

Appellant Higa was hired by Northwest Acute Care Specialists ("NACS") in September 2018. 4-ER-490.[6] Pursuant to a contract between NACS and Legacy, Higa worked as a physician assistant in the emergency department. 4-ER-505–71. Higa is still employed with NACS and continues to work at Salmon Creek as a physician assistant. 4-ER-494.

Higa's work as a physician assistant in the emergency room at Salmon Creek required his direct, in-person contact with Legacy's patients and other

---

[6] The deposition transcript of Toby Higa was attached to the Declaration of Aaron R. Doyer as Exhibit A.

127225039.4 0015023-00428

providers. 4-ER-489–90, 572–74. Higa's job duties included physical examinations of the patients under his care. 4-ER-491–92, 497–502. According to Higa, on a typical day, his first task was to "sit in the triage booth with a nurse for, depending on the shift, one to three hours . . . doing a medical screening exam on patients." 4-ER-491. The remainder of his shift consisted of a mix of "direct contact" with patients and other providers, "reviewing labs, reviewing consultation notes, [and] changing medications." 4-ER-492. Higa admitted that he "could not perform all [his] job duties at Legacy, as they existed in August-October 2021, without having direct and in-person contact with co-workers and patients." 4-ER-573. He made the same admissions in his complaint to the Oregon Bureau of Labor and Industries ("BOLI"). 4-ER-582 ("Due to my occupation, I can only be involved with patient care"); 4-ER-497–98, 590.

On October 14, NACS sent an email to Higa informing him that he was being placed on an unpaid leave because he had yet to provide documentation that he would be fully vaccinated by October 18, 2021. 4-ER-625. On October 15, 2021, Higa received the Johnson & Johnson COVID-19 vaccine. On the same day, he emailed proof of his vaccination to NACS, which then forwarded it to Legacy. *Id.* On October 16, NACS emailed Higa to inform him that he would be placed back on the schedule at Salmon Creek on October 30—the first day that he would

- 21 -

be fully vaccinated (after receiving the Johnson & Johnson vaccine on October 15). 4-ER-636–37. Higa continued working at Salmon Creek beginning on October 30. 4-ER-495–96.

### 2. Appellant Aimee Sweet—Respiratory Therapist

Appellant Sweet was hired at Legacy as a respiratory therapist in 2015 and worked at Salmon Creek. Sweet's job duties included "handl[ing] all clinical applications of respiratory care" in ICUs (including the neonatal ICU ("NICU")) and the emergency room. 4-ER-638–39. She states that she "set up and maintained . . . ventilators," and various types of continuous positive airway pressure ("CPAP") machines for her patients. *Id.* She also performed pulmonary function tests ("PFTs"), checked vital signs, "[p]rovided aerosolized medication delivery," and even "performed sputum induction" (inducing a patient to expel mucus from the respiratory tract). *Id.*

### 3. Appellant Risa Brody—Registered Nurse

Appellant Risa Brody was hired at Legacy as a registered nurse in 2018. 4-ER-540–42. Brody worked as a staff nurse in Salmon Creek's NICU, providing direct, in-person care to critically ill infants, including managing intubation and ventilation lines, collaborating with respiratory therapists, and performing resuscitations. *Id.* Brody admits that she "could not perform all [her] job duties at

- 22 -

Legacy, as they existed in August-October 2021, without having direct and in-person contact with co-workers and patients." 4-ER-648.

### 4. Appellant Damaris Brici—Registered Nurse

Appellant Damaris Brici was hired at Legacy as a registered nurse in November 2020. 4-ER-650–52. Brici worked as a staff nurse and then a charge nurse in the Surgery Department, providing direct, in-person care including supervising healthcare personnel, preparing patients, rooms, sterile instruments, equipment, and supplies for surgery, operating, assembling, or adjusting lights, suction machines, and diagnostic equipment, caring for and disposing of tissue specimens, and preparation and application of dressings following surgery. 4-ER-653–54.

### 5. Appellant Brianna Hall—Registered Nurse

Appellant Brianna Hall was hired at Legacy in 2005 and began working as a nurse in Preadmission Services at Salmon Creek in 2020. 4-ER-655–59. Her job frequently required her to have incidental contact with patients, families, and providers. 3-ER-472–73, ¶ 4. Nurses in preadmission services work in offices that are located either in the main hospital building or the medical office building. 3-ER-473, ¶ 5–6. It is impossible to avoid walking through the hospital or medical services buildings to reach these offices, as there is no direct, private access. *Id.*

- 23 -

In other words, accessing them requires entering through hospital areas shared with patients, families, and other providers. *Id.*

Hall's job duties also required that she provide some direct, in-person care, as patients came to the lab each week and required direct interaction with staff nurses, such as Hall, in preadmissions services. *Id.*, ¶ 7. Hall was also subject to being called to work in the hospital at any time should the need arise, such as from a large-scale disaster or public health crisis like the COVID-19 pandemic. *Id.*, ¶ 8.

### 6. Appellant Ivan Atanassov—Respiratory Therapist

Appellant Ivan Atanassov was hired at Legacy in June 2012. 4-ER-660–62. In 2021, he was working at Salmon Creek as a respiratory therapist providing direct, in-person care including, as Atanassov described: "Assess patients, breathing treatments, ventilator management, intubation assist, cough assist, chest physical therapy, extubation, ekg, non-invasive ventilation set ups, [and] ABGs[.]" 4-ER-666.

### 7. Appellant Daniela Marianu—Registered Nurse

Appellant Daniela Marianu was hired at Legacy in April 2010. 4-ER-669–72. In 2021, she was working in the NICU at Salmon Creek providing direct, in-person care to critically ill infants, including providing "physical care for neonatal patients," caring for "babies that were in critical condition . . . help[ing] parents

- 24 -

with baby care," and collaborating with nutritionists. 4-ER-676. Marianu admits that she "could not perform all [her] job duties at Legacy, as they existed in August-October 2021, without having direct and in-person contact with co-workers and patients." 4-ER-683.

### 8. Appellant Angela Loghry—Registered Nurse

Appellant Angela Loghry worked for Legacy for several years. 4-ER-685–88. She moved into the position of charge nurse in the Salmon Creek NICU in January 2021 where she provided direct, in-person care to critically ill infants, including "care of neonatal patients" and "attend[ing] birth deliveries." 4-ER-692, 695–96. Loghry also supervised other nurses and "[f]illed [the] neonatal resuscitation role as needed." 4-ER-695–96. Loghry admits that she "could not perform all [her] job duties at Legacy, as they existed in August-October 2021, without having direct and in-person contact with co-workers and patients." 4-ER-700.

### 9. Appellant Harold Williams—Distribution Technician

Appellant Harold Williams was hired at Legacy in 2009. 4-ER-702–04. In October 2021, he was working at Salmon Creek as a Distribution Technician where his daily work involved frequent incidental contact with patients and families and frequent direct contact with other Legacy staff and providers. 3-ER-

- 25 -

410–11, ¶ 4.  His job was primarily to receive mail and to deliver it around the Salmon Creek campus.  3-ER-411, ¶ 6.  Each workday, Williams would deliver mail, packages, equipment, and other items to different desks, offices, and storerooms throughout Salmon Creek, including the Imaging Department, Surgical Services, various nurse's stations, and supply closets.  *Id.*  Williams spent on average around 2–3 hours per day traveling around Salmon Creek facilities making deliveries.  *Id.*

Although Williams' job typically did not require him to enter patient care rooms, it did require him to frequently travel through areas of the hospital shared with medical providers.  *Id.*, ¶ 7.  It also required him to visit different departments throughout the hospital and medical services building, and to deliver to locations where providers worked, such as nurse's stations.  *Id.*  When Mr. Williams was working at the receiving dock, he worked alongside other employees who also then traveled throughout Salmon Creek facilities.  *Id.*  He was also required to interact with clinical staff who came to the receiving area to pick up certain packages (for example, if a package was needed for a procedure that was scheduled for the same day it arrived).  *Id.*

- 26 -

127225039.4 0015023-00428

### J.  Appellants' Religious Exception Requests

Each of the Appellants requested from Legacy to be excepted from the Vaccine Policy as a religious accommodation, and each of Appellants' requests were denied because such an accommodation imposed an undue hardship on Legacy.  Each of the Appellants, except for Higa (who was not a Legacy employee), were terminated by Legacy for failing to comply with the Vaccine Policy.  As noted above, Higa was placed on an unpaid leave of absence by NACS, who then reinstated him after he elected to become vaccinated against COVID-19. Upon proof of vaccination, Legacy permitted Higa to return to work at Salmon Creek.

### K.  Procedural History

On December 23, 2022, Appellant Williams filed a Complaint against Legacy alleging Title VII and state-law religious discrimination claims related to Williams' request for a religious exemption from the Vaccine Policy.  4-ER-751. On July 26, 2023, the district court entered an order consolidating *Higa v. Legacy Health*, No. 23-cv-5205, ECF 29 (W.D. Wash. July 26, 2023); *Marianu v. Legacy Health*, No. 23-cv-5586, ECF 12 (W.D. Wash. July 26, 2023); and *Brody v. Legacy Health*, No. 23-cv-5595, ECF 14 (W.D. Wash. July 26, 2023)—also alleging

- 27 -

claims for discrimination against Legacy related to religious exemption requests from the Vaccine Policy—into the consolidated action at bar.  5-ER-767.

Legacy moved for summary judgment on all of Appellants' claims on May 31, 2024.[7]  4-ER-712.  On August 29, 2024, the district court granted Legacy's motion in its entirety and ordered the dismissal of all Appellants' claims.  2-ER-6.  Appellants' appeal followed.

## V.     SUMMARY OF ARGUMENT

Appellants assert two arguments in their appeal: that a dispute of fact exists as to whether Appellants' requested accommodations imposed an undue hardship on Legacy, and that a dispute of fact exists as to whether Legacy failed to interact with them regarding their requested accommodations.  Both arguments fail, and neither is a close call.

First, Appellants have failed to create a genuine dispute as to any material fact concerning undue hardship.  As the District Court correctly concluded, Appellants "fail[ed] to point with any specificity to evidence" that rebuts Legacy's overwhelming showing that allowing unvaccinated healthcare professionals to continue working in close proximity with vulnerable patients and staff would

---

[7] NACS joined Legacy's Motion for Summary Judgment on June 24, 2024.  3-ER-297.

127225039.4 0015023-00428

impose substantial increased costs on Legacy, and would therefore constitute an undue hardship. The U.S. Supreme Court has held that some cases do not "require submission to a jury" because they are "so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). This is such a case.

Second, Appellants' newly raised standalone failure-to-interact argument should be rejected for two independent reasons. First, Appellants waived the argument by failing to raise it in the district court. Second, the argument is meritless. Legacy submitted uncontradicted evidence that it had, in fact, engaged in good faith with Appellants' proposed accommodations—evidence that Appellants altogether ignore. The District Court's decision was correct and should be affirmed.

## VI. STANDARD OF REVIEW

"A grant of summary judgment is reviewed de novo." *Citicorp Real Est., Inc. v. Smith*, 155 F.3d 1097, 1103 (9th Cir. 1998). "[V]iewing the evidence in the light most favorable to the non-moving party, [the Court] must decide whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Okonowsky v. Garland*, 109 F.4th 1166, 1178 (9th Cir. 2024) (internal

- 29 -

quotation marks omitted). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

## VII.  ARGUMENT

The district court correctly determined that Appellants' failure-to-accommodate claims under Title VII and the Washington Law Against Discrimination ("WLAD") fail because exempting Appellants from COVID-19 vaccination, and allowing them to continue to work while unvaccinated would have imposed an undue hardship on Legacy.[8]  It was undisputed below—and Appellants still do not dispute—that each of their roles required them to work on-site and interact directly with Legacy patients and staff.[9]  Legacy's decision that accommodating Appellants would result in undue hardship is supported by the wealth of undisputed materials attached to Legacy's motion for summary judgment

---

[8] The analysis of all Appellants' state and federal claims in this lawsuit are identical.  *Black v. Grant Cnty. Pub. Util. Dist.*, No. 2:17-CV-365-RMP, 2019 WL 2617236, at *7 (E.D. Wash. June 26, 2019), *aff'd in part and rev'd in part on other grounds*, 820 F. App'x 547 (9th Cir. 2020); *Suarez v. State*, 23 Wn. App. 2d 609, 620-21, 517 P.3d 474 (2022), *review granted in part, denied in part*, 200 Wn.2d 1026, 523 P.3d 1186 (2023); *Kumar v. Gate Gourmet Inc.*, 180 Wn.2d 481, 501, 325 P.3d 193 (2014); Toby Higa Amended Complaint ¶ 56.
[9] *See* discussion *supra*, Section IV.I, and citations therein.

- 30 -

showing that at the time Appellants submitted their requests, the information available to Legacy demonstrated that COVID-19 vaccines were safe and highly effective at preventing infection, reducing transmission, and reducing the odds of severe illness and death. Additionally, Legacy put forth uncontroverted evidence that the new COVID-19 Delta variant would (and did) result in a surge of new patients in Legacy's facilities, thus demonstrating the critical need for additional protections against COVID-19 for Legacy's patient and caregiver population beyond the PPE and voluntary vaccination efforts already in practice, which proved to be insufficient measures on their own.[10] This Court should affirm the district court's careful decision.

> **A. Legacy Was Not Required to Accommodate Appellants' Alleged Religious Beliefs Because Doing So Would Have Imposed an Undue Hardship**
>
> > **1. Existing Authority Supports Legacy's Position that an Accommodation that Poses Health and Safety Risks to Others Results in "Substantial Increased Costs" Under *Groff***

An employer need not accommodate an employee's religious beliefs if doing so would impose an "undue hardship." *Groff v. DeJoy*, 600 U.S. 447, 453 (2023). An employer establishes undue hardship under Title VII and WLAD by

---

[10] *See* discussion *supra*, Section IV.D–F, and citations therein.

- 31 -

demonstrating that a religious accommodation would result in "substantial increased costs in relation to the conduct of its *particular business*." *Id.* at 470–71 (emphasis added);[11] *Suarez v. State*, 3 Wash.3d 404, 552 P.3d 786, 790–91, 798–99 (2024) (noting that the undue-hardship standard under WLAD mirrors *Groff*'s standard). When evaluating undue hardship, courts must "take[] into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [an] employer." *Groff*, 600 U.S. at 470–71.

Importantly, the "costs" to be examined as part of an undue hardship analysis are not limited to monetary expenses. "Costs" may include "hardship on the plaintiff's coworkers." *Opuku-Boateng v. California*, 95 F.3d 1461, 1468 (9th Cir. 1996); *see Groff*, 600 U.S. at 472 ("an accommodation's effect on co-workers may have ramifications for the conduct of the employer's business"). Costs may also include an increase in safety and liability hazards in the workplace and other non-economic effects. *See Bhatia v. Chevron U.S.A., Inc.*, 734 F.2d 1382, 1383–

---

[11] Legacy's "business" is providing high quality, safe, effective healthcare to its patients and promoting good health and wellbeing in the local community. 3-ER-416; *see also* 2-ER-17 ("Plaintiffs do not dispute the self-evident proposition that the 'business' of a hospital system such as Legacy includes the ability to protect and uphold the health of its patients and staff.").

84 (9th Cir. 1984); *MacDonald v. Oregon Health & Sci. Univ.*, No. 3:22-CV-01942-IM, 2024 WL 3316199, at \*7 (D. Or. July 5, 2024) (observing that cost to an employer's mission is an appropriate non-economic cost to consider when analyzing undue hardship).[12]

Although the Ninth Circuit has not yet had occasion to address the issue, other circuits applying *Groff* have concluded that allowing an unvaccinated employee to continue working under circumstances that pose health and safety hazards creates an undue hardship for the employer. For example, in *Melino v. Boston Medical Center*, 127 F.4th 391 (1st Cir. 2025), the First Circuit considered whether a medical center violated Title VII by terminating the employment of a

---

[12] The EEOC's Guidance for employers regarding COVID-19-related workplace accommodations is in accord. That Guidance provides that costs to be considered "include not only direct monetary costs but also the burden on the conduct of the employer's business—including, in this instance, the risk of the spread of COVID-19 to other employees or to the public." EEOC, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, at Section L.3 (updated July 12, 2022), Section L.4 (updated Mar. 1, 2022), Section L.5 (updated Mar. 1, 2022), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws. Furthermore, an employer "is not obligated to provide the reasonable accommodation preferred by the employee" and "may consider the cumulative cost or burden of granting accommodations to other employees." *Id.*; *see Groff*, 600 U.S. at 471 ("We have no reservations in saying that a good deal of the EEOC's guidance in this area is sensible and will, in all likelihood, be unaffected by our clarifying decision today.").

- 33 -

registered nurse in a hospital's cardiac intensive care unit for refusing to receive a COVID-19 vaccination. *Id.* at 394. With respect to undue hardship, the court observed that no evidence in the record contradicted the medical center's evidence that vaccination mitigated the effects and spread of COVID-19. *Id.* at 397–98. Permitting the nurse "to work unvaccinated would pose an undue hardship by increasing the risk of COVID-19 transmission amongst staff and patients." *Id.* at 397 (internal quotation marks omitted); *see also Rodrique v. Hearst Commc'ns, Inc.*, 126 F.4th 85, 91–93 (1st Cir. 2025) (holding that it was reasonable for an employer to rely on "objective, scientific information available to it, with particular attention to the views of public health authorities," and to "conclude that the vaccine reduces the likelihood of transmitting the virus, and therefore that exempting employees from the vaccination requirement would pose a threat to the health of others" (alteration and internal quotation marks omitted)).

The Second Circuit similarly held that an employee's refusal to obtain the COVID-19 vaccine can result in "substantial increased costs" under *Groff* and thus create undue hardship for an employer. *See Russo v. Patchogue-Medford Sch. Dist.*, No. 24-378-cv, 2025 WL 610302, at *3 (2d Cir. Feb. 26, 2025) (holding that defendant-employer met its burden of showing that a proposed accommodation would result in substantial increased costs where the employer "would have

- 34 -

incurred significant expenses employing someone to cover [the plaintiff's] necessary in-person duties").

District courts in this circuit have also concluded that an employer need not approve religious exceptions to COVID-19 vaccination where doing so would present risks to others. *See, e.g.*, *Nilsen v. Univ. of Wash. Med. Ctr.*, No. C23-1498 MJP, 2024 WL 4723233, at *12 (W.D. Wash. Nov. 8, 2024) (holding Defendant Medical Center had "shown convincing and uncontroverted evidence that accommodating those with religious exemptions would have posed an undue hardship to the University by diminishing the safety of its employees, patients, and visitors"); *Slater v. Behavioral. Health Res.*, No. 23-5270 RJB, 2024 WL 4290289, at *5 (W.D. Wash. Sept. 25, 2024) (holding that accommodations' economic and non-economic costs, including the "significant increased health and safety risk" Plaintiff posed, as an unvaccinated worker, to patients and to her coworkers, would have resulted in an undue hardship to Defendant behavioral health clinic); *Strandquist v. Wash. State Dep't of Soc. & Health Servs.*, No. 3:23-CV-05071-TMC, 2024 WL 4645146, at *12 (W.D. Wash. Oct. 31, 2024), *reconsideration denied,* No. 3:23-CV-05071-TMC, 2024 WL 4979859 (W.D. Wash. Dec. 4, 2024) ("'Legacy marshals the specific, unchallenged testimony of epidemiological experts and contemporaneous statistical calculations of risk to prove" it "would

- 35 -

have had to contend with increased risks, transmission, hospitalization, and fatalities from COVID-19 in addition to further incapacitation of its staff." (Internal quotation marks and citations omitted)); *Lavelle-Hayden v. Legacy Health*, No. 3:22-CV-01752-IM, 2024 WL 3822712, at *15 (D. Or. Aug. 14, 2024) (granting summary judgment in favor of Legacy where evidence showed Delta COVID-19 variant would produce surge of new infections and that higher rates of vaccination "generally coincided with a decrease in COVID-19 case counts at [Legacy's] facilities"); *Hailey v. Legacy Health*, No. 3:23-CV-00149-IM, 2024 WL 4253238, at *15 (D. Or. Sept. 20, 2024) ("The unrefuted evidence shows that a single unvaccinated employee in a breakroom during a lunch break could have compromised both employee and patient safety. The unrefuted evidence shows, too, that a single unvaccinated employee interacting with a vulnerable patient could have compromised both employee and patient safety."). This Court should likewise conclude that accommodations that put the safety of patients and colleagues at risk may, under *Groff*, create an undue hardship.

### 2. The Undisputed Evidence in this Case Reveals that Accommodating Employees Whose Jobs Require In-Person Contact Would Pose an Undue Hardship to Legacy

The evidentiary record overwhelmingly demonstrates that accommodating Appellants' religious beliefs would have subjected Legacy to an undue hardship.

- 36 -

Legacy set forth detailed, competent evidence showing (1) "that COVID-19 transmission, illness, and fatalities were at unprecedented levels when the vaccination policy was implemented . . . (2) unchallenged, qualified expert testimony about the mechanics of COVID-19 transmission via close personal contact and how vaccination would reduce that risk . . . and (3) testimony and documentation taken from Plaintiffs themselves that their jobs required the close personal contact conducive to COVID-19 transmission . . . ." 2-ER-19.[13] The burden then shifted to Appellants to come forward with "specific facts," by affidavit or other evidentiary materials, to show "that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see* Fed. R. Civ. P. 56(c)(1) (non-moving-party's assertions must be supported by "citing to particular parts of materials in the record, including depositions, documents, . . . or declarations," or otherwise "showing that the materials cited do not establish the absence . . . of a genuine dispute"). Appellants fail to do so.

For all they have written, Appellants' argument against undue hardship still solely boils down to their bald conclusion that Legacy's non-vaccination-based

---

[13] *See also* discussion *supra*, Section IV.I, and citations therein.

127225039.4 0015023-00428

safety protocols (hand washing, testing, social distancing, etc.) were themselves reasonable accommodations to the Vaccine Policy. Opening Brief ("Br.") 22–23. But Appellants' disagreement with Legacy's facts was not enough to justify denying summary judgment and certainly is not enough to warrant reversal. *See Brit. Airways Bd. v. Boeing Co.*, 585 F.2d 946, 954 (9th Cir. 1978) (holding "supposition, speculation, and conclusory argument of counsel" insufficient to create genuine fact dispute); *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987) ("It is the record made on summary judgment that controls, not that record plus speculative inferences a trier of fact might add; and the only inferences permitted from the summary judgment record itself are those that are reasonable given the substantive law which is the foundation for the claim or defense."); *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment"); *see also Efimoff v. Port of Seattle*, No. 2:23-cv-01307-BAT, 2024 WL 4765161, at *11 (W.D. Wash. Nov. 13, 2024) ("Vague musings by Plaintiff's counsel . . . are not evidence and do not raise a question of material fact."). Appellants entirely fail to "cit[e] to particular parts of materials in the record" supporting their assertions or otherwise show that a genuine dispute of material

- 38 -

fact exists as to whether exempting them from the Vaccine Policy would create an undue hardship. Fed. R. Civ. P. 56(c)(1).

Specifically, Appellants do not dispute that COVID-19 is contagious and can cause severe outcomes, including hospitalization, long-COVID, and death. 4-ER-597–99, ¶¶ 16, 19–21. Appellants do not dispute that they routinely came into close physical contact with patients, patients' family members, and other providers and staff, including those who were vulnerable to COVID-19. *See generally* 4-ER-409–13, 471–75, 485–504, 572–92, 636–711. Appellants do not dispute that masking, testing, social distancing, and similar protective measures are imperfect controls in protecting against COVID-19 and are subject to inevitable human error. 3-ER-417, 421, 423–24, ¶¶ 8, 24, 28; 4-ER-605–06, ¶¶ 35–37; *see, e.g.*, *Slater v. Behavioral. Health Resources*, No. 23-5270 RJB, 2024 WL 4290289, at *5 (W.D. Wash. Sept. 25, 2024) (observing that neither Title VII nor WLAD required the defendant health provider to accommodate the plaintiff, who provided in-person customer service support, where the "accommodations' economic and non-economic costs (including the significant increased health and safety risk [the plaintiff] posed as an unvaccinated worker to Behavioral Health's patients and to her coworkers) would have resulted in an undue hardship to Behavioral Health").

- 39 -

Appellants further do not dispute that Legacy had a responsibility to provide the highest possible level of patient care and to protect patients, employees, and visitors from unreasonable safety risks. 3-ER-423–24, ¶ 28. Appellants do not dispute that Legacy needed to maintain adequate staffing levels to provide high-quality patient care, and would be less able to do so if employees were out ill with COVID-19. *Id.* Appellants do not dispute that, as a major regional healthcare system, Legacy was responsible for ensuring that members of the public felt safe accessing medical care at its facilities. *Id.* Appellants do not contest that vaccines are effective.

Appellants also do not dispute Legacy's evidence showing that COVID-19 vaccines are effective and significantly reduce severe infection, hospitalization, and death. 4-ER-599–600, ¶¶ 23–24. They do not dispute that COVID-19 vaccines reduce the length of time in which one is ill with COVID-19. 4-ER-600, ¶ 25. They do not dispute that vaccination reduces the chance that a vaccinated person develops long-COVID symptoms, including specifically among healthcare personnel. 4-ER-599–600, ¶ 23.

Ultimately, Appellants failed to controvert Legacy's evidence that accommodating Appellants would have placed providers, patients, and their families at risk. 2-ER-18–20. All that they offer is counsel's speculation that "the

- 40 -

practices and procedures sought by the plaintiffs as religious accommodations—masks and other PPE, testing, etc. . . . seemed reasonably effective in containing COVID-19." Br. 22–23. Responding to specific evidence supported by sworn affidavits with unsupported supposition does not raise a genuine dispute of fact. *Brit. Airways*, 585 F.2d at 954.

Appellants try to manufacture a fact dispute by misrepresenting the record. They claim that two portions of Dr. Cohen's expert testimony support a genuine dispute as to whether "practices and procedures [that] had been required in healthcare facilities throughout the United States since the beginning of the pandemic in early 2020 and before COVID-19 vaccines . . . seemed reasonably effective in containing COVID-19." Br. 22. But Appellants do so excising words from Dr. Cohen's testimony. First, they quote Dr. Cohen as stating, "[r]eady access to testing, either through symptom-based strategies or at regular intervals[,] can be effective in healthcare facilities . . . ." Br. 23 (quoting 4-ER-605, ¶ 35). Dr. Cohen's full statement was, "[r]eady access to testing, either through symptom-based strategies or at regular intervals can be effective in healthcare facilities **but is not a sufficient replacement for vaccination.**" 4-ER-605, ¶ 35 (emphasis added). He went on to explain:

- 41 -

> Numerous examples exist of unvaccinated people who did not test positive until several days into their infection and in the interim inadvertently contributed to significant outbreaks among patients, colleagues, and families. Further, testing is not perfectly accurate. False positives are also not uncommon and can be quite disruptive to workplace staffing. Turn around times for diagnostic testing are quite variable and may lead to significant delays in obtaining actionable results.

4-ER-605, ¶ 35 (emphasis added). Appellants do not acknowledge that Dr. Cohen's testimony directly refutes their argument that testing, in the absence of vaccination, would effectively prevent the spread of COVID-19 in medical settings.

Second, Appellants quote Dr. Cohen as stating that "[p]ersonal protective equipment (PPE) can be quite effective on an individual level . . . ." Br. 23 (quoting 4-ER-605, ¶ 36). Again, Appellants' ellipses obfuscate the evidence. Dr. Cohen's statement was: "[W]hile personal protective equipment (PPE) can be quite effective on an individual level, **this is not a substitute for vaccination**." 4-ER-605, ¶ 36. He continued:

> Masks help prevent acquisition of infection though do not help to diminish severity of symptoms once someone is infected. It is impossible to wear PPE constantly, without interruption. Based on my extensive experience with contact tracing in healthcare facilities, many cases of COVID-19 acquired in healthcare settings occurred in break rooms (where healthcare workers had already

- 42 -

> doffed their PPE) as well as in the community. In fact, one large study showed that exposure to co-workers in health care facilities was particularly high risk and that subsequent infections were related to poor PPE adherence. Vaccines have the benefit of stimulating the immune system without interruption, regardless of setting or adherence to PPE. While social distancing is complementary to decreasing spread of infection, healthcare is by nature a team endeavor and it is impossible to socially distance at all times while working on site in healthcare.

*Id.* (emphasis added). Appellants cannot create a fact dispute by slashing words out of an expert's statement. Dr. Cohen's uncontroverted testimony makes clear that methods of protection that predated the availability of the vaccine (such as masking, testing, etc.) are not a substitute for vaccination. *Id.*; *see id.* ¶ 38 ("[I]t was my medical opinion in and around summer and fall 2021 that healthcare organizations should require both vaccination and non-vaccination measures to most effectively mitigate the risks presented by COVID-19."); *see Hailey v. Legacy Health*, No. 3:23-CV-00149-IM, 2024 WL 4253238, at *15 (D. Or. Sept. 20, 2024) (granting summary judgment against plaintiff-employees where plaintiffs ignored sworn expert testimony and submitted into evidence nothing more than their speculative doubts that COVID-19 vaccines were effective).

Appellants next insist that Legacy "did not show definitively that the practices and procedures sought by the plaintiffs as religious accommodations—

- 43 -

masks and other PPE, testing, etc.—would result in substantially increased costs in, or impose a substantial burden on, the operation of its healthcare facilities." Br. 22. Appellants misunderstand Legacy's undue-burden argument, just as they did below. As the district court correctly explained:

> Plaintiffs fundamentally mischaracterize Legacy's argument. Legacy does not assert in its undue hardship analysis that non-vaccination-based safety protocols were a burden that would result from accommodating Plaintiffs' vaccine exemption requests; instead, Legacy asserts that, even with those protocols, having unvaccinated staff interacting with patients and other staff throughout its healthcare system was itself the "substantial" cost to its business of providing healthcare and upholding the health of its patients and staff.

2-ER-19.

Finally, Appellants try to resuscitate their case by arguing—for the first time on appeal—that Legacy's undue hardship defense fails because Legacy never permitted Appellants to show they were "immune" from COVID-19. Br. 6. Setting aside the fact that Appellants waived this argument by failing to raise it below, *see One Indust.*, 578 F.3d at 1158, and setting aside Appellants' failure to submit any evidence into the record supporting their assertion that natural immunity from COVID-19 reduces infection or transmission, Appellants are wrong on the facts. The evidence shows that Legacy considered "natural

- 44 -

immunity" when considering whether exemptions from the Vaccine Policy would impose an undue hardship. *See* 4-ER-602, ¶ 28 ("In patients with prior infection, vaccination boosts antibody levels, cell mediated immunity, as well as increasing duration and spectrum of protection. Vaccination has consistently been associated with lower risk of reinfection and hospitalization across multiple studies."). Legacy ultimately concluded, consistent with CDC guidance, that natural immunity was not equivalent to vaccine-induced immunity. *Id.* This Court should reject Appellants' new and unfounded argument and affirm the district court's grant of summary judgment against them.

### 3. Appellants' Cases Do Not Change the Result

Appellants ignore the evidentiary record and rely on inapposite case law to buttress their fatally flawed argument concerning undue hardship. None of the authorities Appellants cite can cure the lack of evidence supporting their position.

First, Appellants cite as "instructive" *Zimmerman v. PeaceHealth*, 701 F. Supp. 3d 1099 (W.D. Wash. 2023). Br. 19–20. In *Zimmerman*, 50 current and former PeaceHealth employees alleged that PeaceHealth violated Title VII and WLAD by refusing to grant them religious accommodations and instead placing them on unpaid administrative leave. 701 F. Supp. 3d at 1105, 1107. Accepting the plaintiffs' allegations as true (as it was required to do at the pleading stage), the

district court concluded that PeaceHealth had unquestionably demonstrated that at the time PeaceHealth enacted its vaccination mandate for healthcare workers, the scientific consensus was that vaccination of healthcare workers improved patient safety. *Id.* at 1114. But the court could not conclude, on the limited record available to it at the pleading stage, that any accommodation other than unpaid leave created an undue hardship for PeaceHealth. *Id.*

This case is different. At summary judgment, Appellants were required to do more than plausibly allege that their requested accommodation—to be exempted from vaccination and allowed to continue working in person in close proximity to patients and colleagues—would not impose an undue hardship. Instead, Appellants were required to cite specific evidence in the record rebutting Legacy's factual showing. Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 587. Appellants failed to do so. *See Zimmerman*, 701 F. Supp. 3d at 1114–15 (acknowledging that multiple courts had found undue-hardship defense likely to succeed at the summary judgment stage, but that "a ruling for Defendants [on a 12(b)(6) motion to dismiss] would require the Court to draw a number of

- 46 -

inferences in Defendants' favor"). Accordingly, *Zimmerman* does not advance Appellants' argument.[14]

Appellants' invocation of a purported settlement in *Dollar v. Goleta Water District*, No. 2:22-cv-03723, ECF No. 54 (C.D. Cal. Dec. 29, 2022), and an unpublished California Court of Appeal case, *Bingham v. City of San Jose*, No. H051386, 2024 WL 4615360 (Cal. Ct. App. Oct. 30, 2024), fare no better. *See* Br. 21 & n.9, 23. A settlement is, for obvious reasons, not persuasive legal authority on summary judgment. Employers may settle lawsuits for a host of reasons unrelated to the merits. Moreover, *Dollar* did not involve healthcare workers, was not resolved on the merits, and pronounces nothing about undue hardship. *Bingham* is an appeal from a decision on demurrer, not summary judgment. It does not help Appellants.

---

[14] Appellants' reliance on *Lowe v. Mills*, 68 F.4th 706, 718–23 (1st Cir. 2023), *cert. denied*, 144 S. Ct. 345 (2023), is similarly puzzling. In *Lowe*, the First Circuit affirmed the dismissal of plaintiffs' Title VII claims, concluding (among other things) that accommodations that would subject medical providers to a substantial risk of license suspension and other penalties constituted an undue hardship. *Id.* at 723. To the extent Appellants imply that exposure to legal risk represents the only allowable variety of undue hardship, *see* Br. 23 n.10, *Groff* makes clear that they are wrong. *See Groff*, 600 U.S. at 468, 470–71 (explaining that undue-hardship inquiry is a fact-specific analysis that must "take[] into account *all relevant factors* in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of an employer" (emphasis added; alteration and internal quotation marks omitted)).

127225039.4 0015023-00428

**B. Appellants' New Failure-to-Interact Argument Was Not Raised Below and Is Meritless in Any Event**

For the first time, Appellants argue that "at no time during the exemption process did Legacy Health discuss with [Appellants], or offer them a chance to consider, accommodation short of leave or termination." Br. 16. This Court should reject Appellants' argument both because Appellants waived it by not raising it below and because the argument is unsupported by the record.

**1. Appellants Waived Their Failure-to-Interact Argument**

"A party normally may not press an argument on appeal that it failed to raise in the district court." *One Indust., LLC v. Jim O'Neal Distributing, Inc.*, 578 F.3d 1154, 1158 (9th Cir. 2009); *see also Allen v. Ornoski*, 435 F.3d 946, 960 (9th Cir. 2006) ("[A] party cannot treat the district court as a mere ill-placed bunker to be circumvented on his way to this court where he will actually engage his opponents."). This rule is subject to only three exceptions where "(1) there are exceptional circumstances why the issue was not raised in the trial court; (2) the new issue arises while the appeal is pending because of a change in the law; or (3) the issue presented is a pure question of law and the opposing party will suffer no prejudice as a result of the failure to raise the issue in the trial court." *Momox-Caselis v. Donohue*, 987 F.3d 835, 841 (9th Cir. 2021).

127225039.4 0015023-00428

Appellants have not and cannot demonstrate that exceptional circumstances precluded them from raising any alleged failure to interact in the trial court, and the issue did not arise while this appeal was pending as a result of any change in the law. *Id.* Appellants' argument also does not involve a pure question of law. Rather, the argument attempts to recast facts that have existed all along and to which Appellants have not (until now) objected. This Court should reject Appellants' effort to raise new issues on appeal. *See Melino v. Boston Medical Ctr.*, 127 F.4th 391, 398 (1st Cir. 2025) (rejecting as waived plaintiff's argument, which she raised "[f]or the first time on appeal," that her employer "should have addressed whether it could have provided . . . alternative accommodations, beyond the complete exemption she requested").

### 2. Appellants' Argument Is Meritless Because Legacy Interacted in Good Faith with Appellants.

Regardless, Appellants' argument is meritless. Appellants point to no authority that requires Legacy to have specifically "offered" Appellants "a chance to consider accommodation short of leave or termination." Br. 16. The law instead requires that Legacy interact in good faith. *Snapp v. United Transportation Union*, 889 F.3d 1088, 1097 (9th Cir. 2018). *See also Kizer v. St. Jude Children's Rsch. Hosp.*, No. 24-5207, 2024 WL 4816856, at *3 (6th Cir. Nov. 18, 2024) ("The Equal Employment Opportunity Commission (EEOC) publishes a nonbinding

- 49 -

compliance guide for employers covered by Title VII which provides that, '[a]lthough an employer is not required by Title VII to conduct a discussion with an employee before making a determination on an accommodation request, as a practical matter it can be important to do so.'"). It is undisputed that Legacy (1) provided an opportunity for Appellants to request an exemption from the Vaccine Policy; (2) carefully considered each request before its Vaccine Exception Work Group; (3) provided a response, after such consideration, to each Appellant informing them of the result of their request. Legacy manifestly did not delay or obstruct the interactive process, nor "fail to communicate, by way of initiation or response." *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). Legacy acted in good faith.

Additionally, Legacy set forth in detail its analysis of the alleged "accommodations" that Appellants proposed, including the use of existing personal protective equipment, masking, access to testing, staying home while sick, social distancing, and working remotely. 3-ER-424–26, ¶¶ 30–35; 4-ER-604–06, ¶¶ 33–38. The scientific evidence available to Legacy, and upon which it reasonably relied, showed that vaccination was by far the most effective solution to prevent serious risk of infection and death from COVID-19 for its employees, patients, and their families. *Id.* The "alternatives" Appellants identified were the same

- 50 -

precautions that were already being taken prior to availability of the COVID-19 vaccine, and which were insufficient to prevent significant illness and loss of life, as Legacy and other health systems tragically observed. *See generally* 3-ER-419–26; *see also* 3-ER-456–60, 467–70; 4-ER-604–06. The science demonstrated that these precautions were a complement but not an alternative to vaccination. 4-ER-604–06, ¶¶ 33–38. Indeed, the COVID-19 vaccine was the single most effective tool available for mitigating the virus's spread among healthcare personnel and their patients. *Id.* Legacy regularly disseminated this information to its caregivers throughout the pandemic and through its Vaccine Policy. 3-ER-418–19, ¶¶ 11–13; 3-ER-460–61, 464.

Ultimately, Appellants present no evidence rebutting the district court's conclusion that no reasonable accommodation would allow them to be exempted from Legacy's Vaccine Policy. *See* 2-ER-21 ("any accommodation that allowed Higa to continue working with patients would have imposed an undue hardship on Legacy."). This Court should reject Appellants' unsupported assertions to the contrary.

- 51 -

127225039.4 0015023-00428

### 3. Appellants' New Arguments Are Immaterial

Even if Appellants' new failure-to-interact argument was both permissible and persuasive (it is not), the issue is immaterial to the decision on summary judgment, because it ignores a crucial point of law.

A failure to engage in the interactive process, by itself, is not a violation of Title VII. *See, e.g.*, *Snapp*, 889 F.3d at 1095, 1097; *Stephens v. D.B. Roberts, Inc.*, No. 21-35726, 2022 WL 16849063, at *1 (9th Cir. Nov. 10, 2022). Employers do not fail to engage in the interactive process if an alternative accommodation is not possible; instead, "discrimination results from denying an available and *reasonable* accommodation." *Snapp*, 889 F.3d at 1095 (emphasis added). *See Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137–38 (9th Cir. 2001) ("Employers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute *if a reasonable accommodation would have been possible.*" (emphasis added)); *see also Osborne v. Recreational Equip. Inc.*, 196 Wash. App. 1048 (2016) (unpublished) ("Washington courts, like federal courts, do not recognize a freestanding interactive process claim absent a possibility of accommodation").

Regardless, as Legacy demonstrated, it considered each Appellant's request for accommodation. Appellants present no evidence rebutting the conclusion that

- 52 -

there was no accommodation available that would *reasonably* allow them to be exempted from Legacy's Vaccine Policy. This Court should reject Appellants' entreaty to hold otherwise.

## VIII. CONCLUSION

For the foregoing reasons, Legacy respectfully requests that this Court affirm the decision of the district court.

DATED: March 27, 2025.  STOEL RIVES LLP

*s/ Adam S. Belzberg*
ADAM S. BELZBERG
adam.belzberg@stoel.com
AARON R. DOYER
aaron.doyer@stoel.com
WHITNEY A. BROWN
whitney.brown@stoel.com
Stoel Rives LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: 206.624.0900
Facsimile: 206.386.7500

*Attorneys for Appellee LEGACY HEALTH*

- 53 -

**CERTIFICATE OF SERVICE**

I certify that on March 27, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using the appellate CM/ECF System, which in turn automatically generates a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished via the appellate CM/ECF system.

DATED: March 27, 2025.                    *s/ Brie Carranza*
                                          Brie Carranza, Litigation Practice Assistant

127225039.4 0015023-00428

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 24-5977

I am the attorney or self-represented party.

**This brief contains** | 11,021 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated | | .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Adam S. Belzberg | **Date** | 03/27/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*